******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* OSCAR H.*
(AC 43622)

Lavine, Prescott and Suarez, Js.**

*Syllabus*

The defendant, who had been convicted of several crimes, including murder, as a result of the stabbing death of N, appealed, claiming that the trial court improperly admitted into evidence the deposition testimony of B, whom the defendant also stabbed during the same incident, after having improperly determined pursuant to the former testimony exception to the rule against hearsay in the applicable provision (§ 8-6 (1)) of the Connecticut Code of Evidence that B, an undocumented immigrant, who had returned to her native Guatemala prior to trial, was unavailable to testify. The defendant also claimed that his conviction of attempt to commit murder and assault in the first degree as to B violated the constitutional prohibition against double jeopardy because each crime was predicated on the same act against B. Prior to trial, the court granted the state's motion to issue a subpoena for B to be deposed, as her return to Guatemala would put her beyond the state's subpoena power. At the judicially supervised deposition, which was video-recorded and transcribed, the defendant had an opportunity to cross-examine B without any restrictions by the court. B, who spoke no English, thereafter left for Guatemala. At trial, P, a director of an immigrant services organization, testified that she had spoken with B at least once a month after B returned to Guatemala and that, at the state's request, she spoke to B by phone three days before the trial and B indicated that she would not voluntarily return to Connecticut to testify. The defendant argued that the state had failed to establish B's unavailability because, inter alia, P spoke with B only by phone and did not testify that she had seen B in Guatemala, there was no evidence that B had been forced to leave the United States and because the state should have advised B not to return to Guatemala. The trial court admitted the videotaped deposition, concluding that the state had met its burden of establishing B's unavailability pursuant to § 8-6 (1). *Held*:

1. The trial court properly determined that B was unavailable to testify and admitted her deposition testimony at trial, the state having acted in good faith and with due diligence to procure her attendance: under the totality of the circumstances presented, the defendant's rights to confrontation and due process were not violated, as the state made sufficient efforts to establish B's unavailability, the defendant provided no legal authority that required the state to take additional steps beyond those it pursued to procure B's attendance at trial, the state was aware of her immigration status and desire to return to Guatemala, it kept in touch with her throughout the pretrial proceedings through P, who maintained contact with B after she left the United States and, at the state's request, contacted B three days before trial to inquire if she would be willing to return, and, as it was highly unlikely that any additional efforts by the state would have succeeded in convincing B to return voluntarily, this court was not convinced that the state was required to expend any and all available resources to eliminate the complex challenges posed by her immigration status or to extend logistical and financial incentives to induce her return to Connecticut; moreover, despite the defendant's unavailing assertion that, even if B had been properly found to be unavailable, the admission of the deposition transcript violated his rights to confrontation and due process, the defendant had an unfettered opportunity to confront B at the deposition, which was taken under agreed upon parameters and the direct supervision of a judge who did nothing to restrict the defendant's cross-examination of her, B was under oath and subject to the penalty of perjury, the videotape of the deposition reflected her demeanor, the state made no objections to her testimony, and, to the extent that impeachment evidence existed, the defendant declined to present it at trial when given the opportunity to do so; furthermore, any potential that B's examination at trial might have differed from her deposition testimony or that the

defendant might later have become privy to additional information to utilize during cross-examination was speculative and not a basis on which to conclude that his confrontation rights were violated.

2. The defendant could not prevail on his unpreserved claim that his conviction of attempted murder and assault in the first degree violated the constitutional prohibition against double jeopardy, which was based on his assertion that he was punished twice on the same evidence for the same offense against the same victim, B: because attempted murder requires intent to cause the death of the victim, which is not an element of assault in the first degree, and assault in the first degree requires serious injury to the victim with a deadly instrument, which are not elements of attempted murder, those crimes are not the same offense for purposes of double jeopardy, nor can assault in the first degree be a lesser offense included within attempted murder; moreover, although the operative information charged attempted murder and assault in the first degree in separate and distinct counts, nothing in the language of those counts could be construed as evincing any intent by the state to charge the defendant in the alternative, as the charges were not pursued by the state in an alternative manner, nor was such a theory discussed in closing argument, and the defendant requested no instruction, nor did the court give any instruction to the jury, indicating that it should consider the charges only as standing in a greater-lesser relationship; furthermore, the defendant's failure to raise his double jeopardy claim at trial belied any indication that the double jeopardy claim was obvious on the face of the information or in the manner in which the case was charged, and the defendant advanced nothing from which to discern any legislative intent to preclude the prosecution of a criminal defendant for both attempted murder and assault in the first degree.

Argued October 20, 2020—officially released April 27, 2021

*Procedural History*

Substitute information charging the defendant with the crimes of murder, attempt to commit murder, assault in the first degree and risk of injury to a child, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Russo, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Naomi T. Fetterman*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, *John C. Smriga*, former state's attorney, and *Emily D. Trudeau*, assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Oscar H., appeals from the judgment of conviction, rendered following a jury trial, of murder in violation of General Statutes § 53a-54a (a), attempt to commit murder in violation of General Statutes §§ 53a-49 and 53a-54a (a), assault in the first degree in violation of General Statutes § 53a-59 (a) (1), and risk of injury to a child in violation of General Statutes § 53-21 (a) (1). The defendant claims that (1) the trial court improperly determined that the surviving assault victim, B, was unavailable to testify at trial and, on the basis of that determination, admitted B's prior deposition testimony into evidence in violation of our rules of evidence and his constitutional rights to confrontation and due process, and (2) his conviction of both attempted murder and assault in the first degree violated the constitutional prohibition against double jeopardy because each crime was predicated on the same act and against the same victim, B.[1] We disagree with both claims and, accordingly, affirm the judgment of the court.

The jury reasonably could have found the following facts on the basis of the evidence admitted at trial. The defendant and N began a romantic relationship sometime in 2006 or 2007. In 2010, they had a child together, S. The defendant, N, and S lived together in a small basement apartment in Bridgeport.

In January, 2017, approximately one month before the events at issue, N spoke to her mother, L, about problems in her relationship with the defendant. Specifically, she complained that the defendant had been increasingly acting jealous and was following her. N asked L to speak with the defendant on her behalf. N told her mother, "I can't stand him anymore," and that she wanted to leave him. When L spoke to the defendant soon thereafter, he told L that S had been saying things to him about N that led him to believe that N was cheating on him with another man.

On February 10, 2017, N's friend and coworker, B, who recently had broken up with a boyfriend with whom she had been living, moved into the Bridgeport apartment with N and the defendant. B and N worked together cleaning houses in Fairfield and Westport. B, like N, had been born in Guatemala, and she had come to the United States in 2013 as an undocumented immigrant.

On February 16, 2017, N, N's sister, the defendant, and B attended a baby shower for one of the defendant's relatives. During the shower, N's sister had a private conversation with the defendant. The defendant told N's sister that N wanted "to split from him" but that "he could not be separated from [N] because [N] was the love of his life."

On February 23, 2017, after they had finished work

for the day, N and B picked up S from her school. The three of them then picked up the defendant from his place of work in Norwalk. The defendant told them that he needed to visit one of his sons,[2] who was in a hospital in Greenwich. The defendant dropped off N, B, and S at L's house in Stamford while he went to visit with his son. When the defendant picked them up to return to Bridgeport, he had "a bag with beer in it." He drank one beer while he drove back to the Bridgeport apartment. Once at the apartment, the defendant drank three or four more beers, and N and B drank "Micheladas," a mixture of beer and Clamato juice.

Later in the evening, N saw a posting on Facebook indicating that a female friend was at a local club, and N and B discussed joining her. After N obtained "permission" from the defendant to go, N and B left, still dressed in the clothes they had worn to work that day. At least three other female friends were at the club when B and N arrived, and N bought "a bucket of beers," which amounted to one beer for each of the women. The women danced and sang karaoke. While they were at the club, the defendant made at least two video calls to N, asking her to move her phone around so that he could see who was with her at the club. B and N stayed at the club for between one and one and one-half hours before returning to the apartment at about 1 a.m.

Although the defendant and N seemed to be getting along at first, while B was in the bathroom getting ready for bed, she heard N scream for her help. She came out of the bathroom to find the defendant holding N by her hair with a knife to her neck.[3] After cutting N's throat, the defendant attacked B, stabbing her in the lower back. B begged the defendant not to kill her because she had children who needed her support, but the defendant stabbed her in the neck. B held her breath while the defendant kicked her and N to see if they were alive. Convinced that neither was breathing, he went into the bathroom to wash the victims' blood off himself in the shower.

After showering and changing his clothes, the defendant retrieved S, who was asleep in her bedroom, and fled the apartment, necessarily passing through the bloody crime scene in the living area. When she heard the door of the apartment close, B, who was still alive, dragged herself toward the door so that she could yell for help from the landlords who lived upstairs. The landlords heard B calling out and came downstairs to investigate.[4] They observed N's body lying on the floor and called 911.

Officer Phillip Norris arrived on the scene at approximately 2:55 a.m. in response to a dispatch call. He observed N and B lying on the floor, both badly injured. N was not visibly breathing, but B was moving. When paramedics arrived several minutes later, they determined that N was deceased.[5] They transported B to a

hospital by ambulance. B told one of the paramedics that she had been "stabbed with a kitchen knife."[6]

As part of their investigation to locate the defendant, the police learned from N's sister that the defendant had mentioned to her that he might go to his sister's house in Texas if he and N ever separated. The police issued an Amber Alert for the defendant and S that included a description of the defendant's Hyundai Sonata, its license plate number, and an indication that the defendant might be heading south out of the state.[7] Pennsylvania State Police received the Amber Alert as well as information that the defendant's cell phone had been found in Altoona, Pennsylvania. Officers were directed to take up positions along several of Pennsylvania's interstate highways. At approximately 11 a.m., Pennsylvania police observed a vehicle matching the description of the vehicle described in the Amber Alert and initiated a traffic stop. The defendant initially complied with orders given by the police via their vehicle's public address system to open his car door and put his hands through the window. He did not comply, however, with their subsequent order that he exit the vehicle. Rather, he abruptly closed his door and sped away. A high speed chase ensued for approximately five miles, ending with the defendant crashing his car into the back end of a tractor trailer. The defendant was rendered unconscious by the crash. S was found crying in the backseat of the vehicle. The police took the defendant into custody and transported him to a hospital via ambulance.

As part of their investigation of the crime scene, the police found two knives in the Bridgeport apartment. One of the knives was located underneath N's hand. Although she was not holding the knife, her thumb was resting on the knife's handle.[8] A forensic analysis of the knives revealed that the defendant's DNA profile was included in a sample taken from the hilt of one knife and could not be eliminated as a contributor to a sample collected from the handle of the other knife.

The state charged the defendant in a four count amended information.[9] Count one charged the defendant with murdering N. Counts two and three were directed at the defendant's acts against B, accusing him of attempted murder and assault in the first degree with a dangerous instrument. Specifically, count two of the information alleged that the defendant, "with intent to cause the death of [B], did stab and attempt to cause the death of [B] . . . ." Count three alleged that, on the same date, time, and location referred to in count two, the defendant, "with intent to cause serious physical injury to [B], did cause serious physical injury to [B] with a dangerous instrument, to wit: a knife . . . ." Count four accused the defendant of risk of injury to a child.[10]

The defendant testified on his own behalf at trial,

essentially claiming that the two women had been intoxicated, they had attacked each other with knives, and he had not intentionally harmed either woman but had struggled to take a knife from B after she had attacked him. He also claimed that he had fled with S from the apartment to shield her from the bloody aftermath of the event.[11] The jury apparently did not credit the defendant's version of events, finding him guilty of all charges. The court sentenced the defendant to a total effective term of seventy-five years of incarceration.[12] This appeal followed. Additional facts and procedural history will be set forth as needed.

I

The defendant first claims that the court improperly admitted into evidence a videotape and transcript of the pretrial deposition testimony of B, who did not testify at trial. Specifically, the defendant argues that the court improperly determined that B was unavailable, a foundational prerequisite for the admission of former testimony under our rules of evidence and to comport with constitutional rights of confrontation and due process. We are not persuaded by the defendant's arguments.[13]

The following additional facts and procedural history are relevant to this claim. On June 19, 2017, the defendant entered a plea of not guilty and elected a jury trial. On September 27, 2017, the state filed a motion to advance the time of trial. The state argued in its motion, inter alia, that B, who was the sole living eyewitness to the charged crimes, was not a citizen of the United States and had expressed a desire to return to her home country, which would put her beyond the reach of the state's subpoena power.[14] The state asserted that the advancement of the trial would "not work an unfair hardship on the defendant and [would be] in the interest of justice" because B's unavailability as a witness would "work a substantial hardship upon the state and result in a miscarriage of justice." At a hearing on the state's motion, the defendant objected on the grounds that he had not had sufficient time to meet with his defense attorney and the defense lacked information regarding tests being performed on evidence at the state laboratory. The court, *Devlin, J.*, granted the motion on October 4, 2017, but indicated that the trial date would not be set until after all relevant laboratory tests were completed.

On October 17, 2017, the state filed a motion pursuant to Practice Book § 40-44 asking the court to issue a subpoena for B to appear for a deposition. In that request, the state indicated that B's testimony would be necessary at trial. It further stated that B was not a citizen of the United States, but a native of Guatemala, and that she had "expressed an intention of imminent return there, thus rendering herself beyond the reach of the state's subpoena power." According to the state,

B was unable to work due to the serious nature of the injuries she had sustained. Furthermore, B purportedly was the mother of four children in Guatemala "who have previously been cared for by her father, who is no longer capable of doing so." Initially, the defendant did not oppose the taking of the deposition but later raised a number of objections, primarily concerning difficulties pertaining to defense counsel's schedule in other matters and the need for Spanish speaking interpreters for both the defendant and B. The court nevertheless granted the state's motion and scheduled the deposition.

The court, *Pavia, J.*, judicially supervised the taking of B's deposition, which was conducted in court on November 21, 2017. The deposition was videotaped in accordance with agreed upon procedures and recorded for transcription by a court monitor. During the deposition, B testified that the defendant had stabbed her and N. The court, at the request of the defendant, took a recess after B's direct testimony to provide defense counsel with an opportunity to discuss B's testimony with the defendant. Following the recess, the defendant had an opportunity to thoroughly cross-examine B about her direct testimony. The court did not place any restrictions on the cross-examination.

At trial, the state presented testimony from Lorely Peche, a family and school services director at Building One Community, an organization that provides immigrant support services. Peche had acted as a conduit for B with both the state's attorney's office and the Office of the Victim Advocate because B spoke no English. According to Peche, at the state's request, she had spoken with B about the trial three days prior. Peche stated that B was in Guatemala and that she spoke with B about her willingness to return to testify. B indicated to Peche that she did not have the ability to get documentation to return to the United States and that she would not voluntarily return to Connecticut to testify.

On cross-examination, Peche stated that she had spoken with B at least once a month since she had left the country, which was shortly after her deposition, and that B had left voluntarily. When asked by defense counsel if she was aware of any program that allowed undocumented immigrants to remain in the country because of their status as a crime victim, Peche answered that she did not know of any such program. She stated that she had B's current phone number in Guatemala and had provided that information to the Office of the Victim Advocate.

The following day, the state offered B's videotaped deposition testimony as a full exhibit under the former testimony exception to the hearsay rule. It asked the court to find, on the basis of Peche's testimony, that B was unavailable because she was in Guatemala and

there was no compulsory process available to the state to bring her to Connecticut, noting that the out-of-state subpoena statute applied only to individuals in the United States. The prosecutor represented to the court that B had left the United States because she could no longer work and because she had family in Guatemala who could support and care for her. The state took the legal position that, because B had stated on more than one occasion that she would not return to the United States, and the state had no legal means to compel her to do so, she was unavailable.

The defendant argued that the state had failed to establish B's unavailability because it had failed to offer a witness who could represent to the court, "yes, I know where [B] is, I have seen her, she is in Guatemala." According to the defendant, Peche was not such a witness because she had spoken with B only by phone. The defendant also argued that there was no evidence that she was forced to leave the country and that "she should have been advised [by the state] that she could not go back [to Guatemala]." The defendant provided no authority that the state had a duty or the power to keep B from returning to Guatemala.[15] Although the defendant conceded that he had had an opportunity to cross-examine B at the time she gave her deposition testimony, the defendant also argued that, "due process-wise," his cross-examination of B would have been different if he had had the benefit of other witnesses' trial testimony at the time of the deposition.

After reviewing the deposition, the court granted the state's request to admit B's videotaped deposition. The court expressly found Peche's testimony credible and sufficient to establish the fact that B had returned to Guatemala. The court continued: "[T]he Connecticut Code of Evidence is basically leaving unavailability to each court on a case-by-case basis. And the court, after hearing from [the state], does make the reasonable inference that she returned to Guatemala, not because she was uncooperative in any degree; in fact, the court does believe she was somewhat cooperative, but she had left for different reasons—different personal reasons other than the advancement of the prosecution of this case. So, the court does find that her having been returned to Guatemala voluntarily, and the fact that she's beyond the state's subpoena power and had cooperated in part, the court does find that the state has met its burden of demonstrating unavailability." The court also found that the state had met its burden of establishing the two additional foundational elements necessary under § 8-6 of the Connecticut Code of Evidence,[16] concluding that B was deposed on substantially the same issues as those in the trial, and that the defendant had had a fair opportunity to develop the testimony being offered.[17]

We now turn to our discussion of the defendant's

claim. We begin with pertinent legal principles. Under our rules of evidence, former testimony by a witness is not excluded under the hearsay rule if the witness is unavailable to testify at trial, the former testimony and current proceedings involve substantially similar issues, and the opposing party had an opportunity to question the witness when the former testimony was elicited. See Conn. Code Evid. § 8-6 (1). Even if this evidentiary standard is met, however, in a criminal prosecution, the testimony must also pass constitutional muster.

The right to confront a witness through cross-examination is fundamental and essential to a fair trial; see *Pointer* v. *Texas*, 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965); but courts recognize an exception to confrontation rights if a witness is (1) unavailable at trial and has (2) provided testimony at a prior judicial proceeding that was subject to cross-examination by the defendant. See *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ("[w]here testimonial evidence is at issue . . . the [s]ixth [a]mendment demands what the common law required: unavailability and a prior opportunity for cross-examination"). Under such circumstances, the former testimony may be admitted without violating the confrontation clause. In other words, a twofold approach is proper in analyzing an alleged denial of the right to confrontation by the admission of former testimony; first, a threshold inquiry into the unavailability of the witness and, second, an inquiry into the adequacy of cross-examination of the witness at the first proceeding. It is the unavailability determination of the court that the defendant challenges in the present appeal.

In *State* v. *Lebrick*, 334 Conn. 492, 506–507, 223 A.3d 333 (2020), our Supreme Court recently had the opportunity to evaluate the reasonableness of the state's efforts to produce a witness for trial and, in so doing, clarified the appellate standard of review applicable to the present claim. "[T]he issues of the unavailability of the witness and the reasonableness of the [s]tate's efforts to produce the witness [under] the [c]onfrontation [c]lause [of] the [s]ixth [a]mendment . . . are mixed questions of law and fact . . . ." (Internal quotation marks omitted.) Id., 506. Accordingly, "[a]lthough we are bound to accept the factual findings of the trial court unless they are clearly erroneous . . . the ultimate determination of whether a witness is unavailable for purposes of the confrontation clause is reviewed de novo." (Citation omitted; internal quotation marks omitted.) Id., 507.

The court in *Lebrick* reiterated that "[f]ormer testimony . . . is inadmissible under both our rules of evidence and the confrontation clause unless the state has made a reasonable, diligent, and good faith effort to procure the absent witness' attendance at trial. This

showing necessarily requires substantial diligence. In determining whether the proponent of the declaration has satisfied this burden of making reasonable efforts, the court must consider what steps were taken to secure the presence of the witness and the timing of efforts to procure the declarant's attendance. . . . A proponent's burden is to demonstrate a diligent and reasonable effort, not to do everything conceivable, to secure the witness' presence. . . . Indeed, it is always possible, in hindsight, to think of some additional steps that the prosecution might have taken to secure the witness' presence, but the [s]ixth [a]mendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising. . . . But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 508–509.

Although recognizing that any number of factors may be relevant to a reasonableness inquiry in a particular case, our Supreme Court considered the following four factors, adopted from federal case law,[18] in assessing the reasonableness of the state's efforts to produce a missing witness in the context of a criminal trial. See id., 511–12; id., 513 n.11 (noting that consideration of other factors relevant to reasonableness inquiry is not precluded in any particular case). "First, the more crucial the witness, the greater the effort required to secure his attendance. . . . Second, the more serious the crime for which the defendant is being tried, the greater the effort the [state] should put forth to produce the witness at trial. . . . Third, [if] a witness has special reason to favor the prosecution, such as an immunity arrangement in exchange for cooperation, the defendant's interest in confronting the witness is stronger. . . . Fourth, a good measure of reasonableness is to require the [s]tate to make the same sort of effort to locate and secure the witness for trial that it would have made if it did not have the prior testimony available." (Internal quotation marks omitted.) Id., 512.

In *Lebrick*, the issue before the Supreme Court was whether the trial court improperly had determined that a key state's witness in a felony murder-home invasion prosecution was unavailable for trial because she had not been located and, thus, also improperly admitted her former preliminary hearing testimony in violation of the defendant's confrontation clause rights. Id., 503–504. The defendant in *Lebrick* had argued at trial that the state's efforts to procure the witness' in-court testimony were insufficient to meet the evidentiary and constitutional unavailability standard because the state had conducted a far too restrictive electronic search for the witness' then current address and phone number, and had failed to contact relatives, friends, or landlords who might have had helpful information as to her where-

abouts.[19] Id., 503. The trial court had disagreed with the defendant and implicitly found that the state's efforts to locate the witness were sufficient to establish her unavailability for both evidentiary and constitutional purposes. Id. This court rejected the defendant's claim and affirmed the trial court's judgment of conviction, but our Supreme Court, after adopting and applying a less deferential standard of review than that employed by this court, agreed with the claim and reversed this court's judgment. Id., 504–507, 521.

A majority of the Supreme Court concluded that the vigor of the state's efforts to locate the witness was seriously lacking. Id., 518. The court took issue with the fact that the state knew it was dealing with a "crucial and reluctant witness whose testimony at the probable cause hearing had to be procured by court order but nonetheless did not keep apprised of her whereabouts or begin searching for her until . . . shortly before jury selection began." Id., 515. The court also was critical of the efforts of the state's investigator, noting that, "[a]lthough [he] knew that [the witness] was a New York resident, he did not search any New York state governmental databases to look for routine information, such as motor vehicle, social service, housing court, family court, or child support records. He did not use the information in his possession about [the witness'] last known addresses to learn whether she owned her own home or had a landlord who might have knowledge of her whereabouts. Nor did he ever ask anyone else to pursue any of these basic avenues of inquiry." Id. The court also stated that the state's investigator unnecessarily limited his electronic search to databases that contained "relatively narrow categories of information" rather than a more expansive "basic Google search engine" or "any of the most popular social media sites, such as Facebook." Id.

The court also took issue with the state's "ground efforts," describing them as "equally anemic." Id., 517. Specifically, the court noted that the state's investigator, after forwarding the addresses he had found to the district attorney's office in New York City to facilitate service of an interstate summons, never spoke with the district attorney's office or requested that anyone in New York "undertake any investigative efforts, knock on doors, talk with neighbors, locate a landlord, follow any leads, or conduct the most minimal surveillance." Id. The court further criticized the efforts of the district attorney's investigator, noting that his visits all had occurred during "normal working hours, when most people with a nine-to-five job would not be expected to be at home." Id. The state's investigator never requested that the district attorney's investigator do any follow-up visits after he reported his initial lack of success. Id., 518.

Finally, in evaluating the reasonableness of the state's

efforts to locate the witness in light of the four factors relevant in criminal cases, our Supreme Court concluded that all but one favored the defendant, noting that (1) the witness' prior testimony had provided the state with "crucial, inculpatory evidence regarding the defendant's role in the commission of the crimes," (2) the crimes for which the defendant was charged were extremely serious, especially the charge of felony murder, which carried a potential sentence of imprisonment for twenty-five years to life; id., 514; and (3) it was unable to "conclude that the state's efforts to locate [the witness] were as vigorous as they would have been if it [had] no preliminary hearing testimony to rely [on] in the event of unavailability." (Internal quotation marks omitted.) Id., 515. Only the third of the four factors favored the state because the witness had no particular reason to favor the prosecution. Id.

In arguing the present claim, the defendant leans into the *Lebrick* decision as generally requiring significant vigor on the part of the state to procure the attendance of a witness at trial before the state may rely on that witness' unavailability as a basis for admitting the witness' former testimony. The *Lebrick* decision, however, primarily concerned the scope of the state's efforts to obtain the current contact information for a witness who was living in a neighboring state and whose attendance readily and legally could have been compelled by way of an interstate warrant if the state had made reasonably diligent efforts to find her. By contrast, the present case is concerned with what efforts the state must take to secure the attendance at trial of a witness whose whereabouts are known, but who has indicated a refusal to voluntarily appear and is outside the subpoena powers of the prosecuting authority. Courts that have considered what constitutes due diligence on the part of the state under these latter circumstances have not required the state to go beyond a good faith inquiry as to the witness' intentions to attend trial in order to establish a witness' unavailability.

More directly on point with the facts of the present case is this court's decision in *State* v. *Morquecho*, 138 Conn. App. 841, 54 A.3d 609, cert. denied, 307 Conn. 941, 56 A.3d 948 (2012). In *Morquecho*, this court affirmed the trial court's determination regarding the unavailability of a witness located in Ecuador and its conclusion that the state had made reasonable efforts to secure the witness' attendance at trial.[20] Id., 862. As in the present case, the defendant in *Morquecho* was facing a murder charge. Id., 842. A key witness had returned to Ecuador. Id., 856. At trial, the state sought to admit the witness' former testimony from a probable cause hearing. Id., 855. To establish that the witness was unavailable for trial and that the state had made reasonable efforts to procure the witness' attendance, the state presented the testimony of an investigator with the Office of the State's Attorney who testified on

the basis of her search that the witness was in Ecuador, although she did not testify that the state had either a current address or telephone number for the witness. Id., 855–56. The state also called a police detective who testified that, "to his knowledge, sometime after [the witness] testified at the probable cause hearing, he returned to Ecuador and remained in that country. . . . [A]pproximately six months earlier, in connection with [an] earlier trial, he obtained [the witness'] telephone number in Ecuador from [his] mother and that he spoke with [the witness]. . . . [H]e told [the witness] that his testimony at trial was crucial and asked [him] to return to Connecticut but [the witness] indicated that '[h]e was not going to come back' and that 'he had no interest in coming back . . . .' Nonetheless, [the witness] asked [the detective] to advise him as to the outcome of the trial." Id., 856. The detective also testified that "he did not speak to [the witness] after that conversation and did not speak to him in connection with the present trial." Id. Finally, the detective testified that "the state provided transportation and immigration assistance to two other witnesses who were living abroad . . . to ensure their presence at the trial." Id.

After the court initially ruled that the state had failed to establish the witness' unavailability, the state called the witness' mother to testify. She testified that "[the witness] was in Ecuador, she spoke with [him] two weeks earlier and [he] did not want to return to Connecticut. . . . [H]e did not want to return to Connecticut because of concerns about what the defendant would do to him if he was released from prison." Id., 857. The state also presented testimony from a different police detective who stated that, "two weeks earlier, with the assistance of a Spanish speaking police officer, he contacted [the witness] in Ecuador and tried to convince him to return to Connecticut. [The witness] refused. . . . [I]n the weeks prior to trial, the police left several messages for [the witness], but he did not respond to these messages." Id.

The prosecutor renewed his request to admit the former testimony of the witness. In arguing that the state had made reasonable efforts to procure the witness' in-court testimony, the prosecutor made a representation to the court that, "although the state had provided travel assistance to two other witnesses *after they had expressed a willingness to return to Connecticut for the trial*, [this witness] had not expressed such willingness. The prosecutor [further] represented: 'I don't think there's any reason to presume that, had . . . [the witness] wanted to come back, that the state would not have [arranged for his transportation to and accommodations in Connecticut]." (Emphasis added.) Id., 858. The trial court ruled that the state had met its burden of demonstrating the unavailability of the witness and admitted the testimony from the probable cause hearing. Id.

On appeal, the defendant in *Morquecho* argued that the state's efforts to procure the witness for trial was "less than diligent" because "the state merely located [the witness] and took at 'face value' his representation that he would not return to testify." Id., 858–59. In affirming the trial court's ruling that the state had made diligent and reasonable efforts, this court noted that the record established "that persons, on behalf of the state, determined [the witness'] whereabouts, conducted research to ensure that he was not in the United States, spoke with him about the importance of his presence at trial and directly inquired if he would return to testify. These efforts were made until the eve of trial." Id., 861. This court expressly rejected the defendant's arguments that "the state conceivably could have done more to secure [the witness'] attendance by providing travel and immigration assistance to [the witness], taking steps to ensure that [the witness] did not leave the country prior to trial and providing protection to [the witness] during his stay in Connecticut," and that "the state undertook greater efforts to secure the presence of other state witnesses who were living abroad." Id.

The United States Supreme Court also has considered for purposes of establishing the unavailability of a witness in a criminal trial what constitutes reasonable and diligent efforts to procure the attendance of a witness whose location may be known but who is purportedly outside the jurisdiction of the prosecuting authority's subpoena powers. See *Barber* v. *Page*, 390 U.S. 719, 724–25, 88 S. Ct. 1318, 20 L. Ed. 2d 255 (1968); see also *Mancusi* v. *Stubbs*, 408 U.S. 204, 92 S. Ct. 2308, 33 L. Ed. 2d 293 (1972). We believe a discussion of these cases is instructive.

In *Barber* v. *Page*, supra, 390 U.S. 719, a habeas corpus petitioner who had been convicted in Oklahoma of armed robbery claimed that his constitutional right to confrontation had been violated at his criminal trial because the evidence establishing his guilt primarily consisted of former testimony by a witness at a preliminary hearing that was admitted despite the fact that the witness did not testify in person at trial because he was not within the jurisdiction of the state but in a federal prison in Texas. Id., 720. The Supreme Court indicated that the only effort made by the state to obtain the witness' presence at trial was "to ascertain that he was in a federal prison outside Oklahoma." Id., 723. The court recognized that "various courts and commentators have heretofore assumed that the mere absence of a witness from the jurisdiction was sufficient ground for dispensing with confrontation on the theory that it is impossible to compel his attendance, because the process of the trial [c]ourt is of no force without the jurisdiction, and the party desiring his testimony is therefore helpless." (Footnotes omitted; internal quota-

tion marks omitted.) Id. The Supreme Court, however, rejected the "accuracy of that theory," because "it is clear that at the present time increased cooperation between the [s]tates themselves and between the [s]tates and the [f]ederal [g]overnment has largely deprived it of any continuing validity in the criminal law." The court noted that federal courts could issue appropriate writs at the request of state prosecutorial authorities and that the United States Bureau of Prisons had a policy to allow federal prisoners "to testify in state court criminal proceedings pursuant to writs of habeas corpus ad testificandum issued out of state courts." Id., 724. Because the state in *Barber* had made absolutely no effort to obtain the witness' attendance at trial by means of legal procedures and processes available to the state, the Supreme Court held that the prosecution had failed to establish the incarcerated witness' unavailability. Id., 725; id. ("[S]o far as this record reveals, the sole reason why [the witness] was not present to testify in person was because the [s]tate did not attempt to seek his presence. The right of confrontation may not be dispensed with so lightly.").

Four years later, in *Mancusi* v. *Stubbs*, supra, 408 U.S. 204, the Supreme Court discussed its holding in *Barber* v. *Page*, supra, 390 U.S. 719, distinguishing its holding in the context of a witness who was not simply in another state but, rather, was a foreign citizen living outside the United States. Specifically, in *Mancusi*, the habeas corpus petitioner had claimed that his murder conviction following a retrial in Tennessee was obtained in violation of his confrontation rights and thus should not have been considered for sentencing purposes in a subsequent criminal proceeding in New York. *Mancusi* v. *Stubbs*, supra, 205. At the petitioner's retrial on the murder charges, the prosecution had sought to have a key prosecution witness who had testified at the petitioner's first trial declared unavailable in order to admit the witness' former testimony. To demonstrate unavailability, the state offered the testimony of the witness' son that the witness, a naturalized American citizen, had left the country and become a permanent resident of Sweden. The trial court granted the state's request, and the witness' former testimony was read to the jury. The petitioner was convicted of murder a second time. Id., 207–209.

The United States Supreme Court concluded that the petitioner's right of confrontation was not violated by the admission of the witness' former testimony because the witness was unavailable. The Supreme Court distinguished the present situation from *Barber*, in which it had concluded that the state had failed to demonstrate reasonable efforts to secure the witness' attendance by simply relying on his absence from the boundaries of the prosecuting state without any effort to use appropriate federal writs or other legal means. Id., 212. Unlike in *Barber*, the witness in *Mancusi* was not just outside

the state but was a resident of another country. Id., 211. Whereas, in *Barber*, the state had available legal procedures to secure the witness' attendance, the court in *Mancusi* noted that "[t]here have been . . . no corresponding developments in the area of obtaining witnesses between this country and foreign nations." Id., 212. The court also noted that, under existing case law and federal statutes, there was no right to subpoena a United States citizen residing in a foreign country for testimony in a state felony trial. Id., 211–12. The Supreme Court did not indicate that, to meet its burden of establishing unavailability, the state was required to make any additional efforts either to coerce or to incentivize the witness' return to the United States. Rather, the court stated: "Upon discovering that [the witness] resided in a foreign nation, the [s]tate of Tennessee, so far as this record shows, was powerless to compel his attendance at the second trial, either through its own process or through established procedures depending on the voluntary assistance of another government."[21] Id., 212.

As observed by the Supreme Court of California in discussing the *Mancusi* holding: "Subsequent to *Mancusi*, the Supreme Court stated in *Ohio* v. *Roberts*, [448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), overruled in part by *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], that 'if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation.' . . . This statement did not alter or detract from *Mancusi*'s analysis that when the prosecution discovers the desired witness resides in a foreign nation, and the state is powerless to obtain the [witness'] attendance, either through its own process or through established procedures, *the prosecution need do no more to establish the [witness'] unavailability*." (Citation omitted; emphasis altered.) *People* v. *Herrera*, 49 Cal. 4th 613, 625, 232 P.3d 710, 110 Cal. Rptr. 3d 729, cert. denied, 562 U.S. 942, 131 S. Ct. 361, 178 L. Ed. 2d 233 (2010). We agree with this assessment.[22]

Under existing United States Supreme Court precedent and precedents of other jurisdictions, for purposes of establishing unavailability, it is sufficient for the state to demonstrate that a foreign national is outside of any reasonable legal means to compel attendance, provided that the state makes inquiry, either itself or through a reliable third party, as to whether the witness will voluntarily return to the jurisdiction for trial. See *Mancusi* v. *Stubbs*, supra, 408 U.S. 204; see also *Commonwealth* v. *Hunt*, 38 Mass. App. 291, 295, 647 N.E.2d 433 (relying on *Mancusi* for proposition that "[w]hen a witness is outside of the borders of the United States and declines to honor a request to appear as a witness, the unavailability of that witness has been conceded because a [s]tate of the United States has no authority

to compel a resident of a foreign country to attend a trial here"), review denied, 420 Mass. 1103, 651 N.E.2d 409 (1995). We agree with the defendant that the state does not meet its burden of demonstrating due diligence to procure the attendance of a witness for trial simply by establishing that the witness is a noncitizen who is not in the United States and outside the state's subpoena powers. Rather, the state has a duty to make some effort to discern whether the witness might voluntarily appear. See *Barber* v. *Page*, supra, 390 U.S. 724 (noting that "possibility of a refusal is not the equivalent of asking and receiving a rebuff" (internal quotation marks omitted)).

We now turn to the present case, in which the record reflects that the state's efforts to procure B's attendance at trial were neither comprehensive nor exhaustive. That, however, is not the standard that we must apply. Rather, the question is whether, in light of all the circumstances known, the state acted in good faith and with due diligence to procure B's attendance. Our plenary review of the record, viewed in light of the relevant legal precedent we have discussed, leads us to conclude that the court properly concluded that B was unavailable for both evidentiary and constitutional purposes.

We begin by noting that all four factors of the nonexhaustive test cited to and utilized by our Supreme Court in *Lebrick* favor the defendant's position that the state was required to make all *reasonable and good faith* efforts to procure B's attendance at trial. See *State* v. *Lebrick*, supra, 334 Conn. 511–12. First, B was a crucial witness for the state because she was the sole eyewitness to the events at issue. Second, the defendant was charged with extremely serious crimes, including murder and attempted murder. Third, as one of the victims of the defendant's crimes, B had a special reason to favor the prosecution in order to obtain justice for herself and her close friend, N. Finally, if B had left the country prior to the state's securing her deposition testimony, something that the state took efforts to ensure did not happen, it is reasonable to presume that the state would have exhausted available efforts to secure her attendance at trial. Nonetheless, the defendant has not provided this court with persuasive legal authority that reasonable and good faith efforts under the circumstances presented necessarily *required* the state to take any additional steps beyond those that it pursued.

The record shows that the state was aware of B's whereabouts and her immigration status and had kept in contact with her through Peche throughout the pretrial proceedings. It was aware of her desire to return to Guatemala as reflected in its motion to advance the trial date and to notice her deposition. After she left the country, Peche maintained contact with B and contacted her at the request of the state to inquire if she would be willing to return for the trial. The most recent

contact was three days prior to Peche testifying, at which point she testified that B remained in Guatemala and, although interested in the outcome of the trial, refused to return to testify. The court found Peche's testimony to be credible.

It is reasonable to infer from the record before the court that, in the absence of some legal means to compel B's attendance, it was highly unlikely that *any* additional efforts on the part of the state would have been successful in convincing B to return voluntarily. She could no longer do the work she had been doing in the United States because of her injuries, and she needed to be in Guatemala both to obtain the support of her family and to take care of her children. Furthermore, it is well settled that the state need not exhaust all possibilities in order to satisfy its burden of establishing the unavailability of a witness, and "[t]he law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists . . . 'good faith' demands nothing of the prosecution." *Ohio* v. *Roberts*, supra, 448 U.S. 74. Accordingly, we are not convinced that the state was required to expend any and all resources available to it to eliminate the obvious and complex challenges posed by B's immigration status or to extend logistical and financial incentives to induce her return to Connecticut. All indications were that such efforts would have been fruitless.

We conclude that, in light of B's status as a foreign citizen located outside the United States, with no indication in the record or argument by the defendant that the state had available any legal means to coerce her return or the cooperation of her home country, and, under the totality of the circumstances presented, the state made sufficient efforts in this case, including discerning whether she would return voluntarily, to establish B's unavailability.

To the extent that the defendant makes the additional claim that, even if the witness were properly found to be unavailable, admission of the deposition transcript was nonetheless violative of his confrontation rights because he did not have an adequate opportunity to cross-examine B at the time her deposition was taken, we summarily reject that claim. "The central concern of the [c]onfrontation [c]lause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact. . . . The right of confrontation includes (1) the physical presence of the witness, (2) the administration of an oath to impress upon the witness the seriousness of the matter and to guard against the lie by the possibility of a penalty for perjury, (3) cross-examination of the witness to aid in the discovery of truth, and (4) the opportunity for the jury to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credi-

bility." (Citation omitted; internal quotation marks omitted.) *State* v. *Lebrick*, supra, 334 Conn. 510.

As argued by the state, we believe that the circumstances of B's deposition testimony reflect that the defendant had an unfettered opportunity to confront B that satisfied all the aforementioned elements. B's deposition was taken under agreed upon parameters, in court, under oath, subject to the penalty of perjury, and with the direct supervision of a judge. The deposition was videotaped and thus reflected B's demeanor while answering questions. The trial court did nothing to restrict the defendant's cross-examination of B about her direct examination, and the state never objected to a single question or avenue of inquiry. Although the record reflects that the defendant chose not to use a potential prior inconsistent statement of B during his cross-examination, he did so with the understanding that he would be permitted to use any impeachment evidence available in the event that the deposition was admitted at trial due to B's unavailability. To the extent that any impeachment evidence existed, however, the defendant declined to present it when he was given an opportunity to do so at trial.

Finally, we agree with the state that any potential that B's examination at trial might have differed from her deposition testimony or that the defendant might later have become privy to additional information to utilize during his cross-examination is speculative and not a basis to conclude that his rights of confrontation were violated. See *State* v. *Crump*, 43 Conn. App. 252, 264, 683 A.2d 402 ("[There is] no authority, under either [the federal or state] constitution, for the proposition that any particular type of cross-examination, as to duration or content, is a requirement that must be satisfied before that prior testimony may be admissible. Neither the state nor federal guarantees of the right of confrontation require that a witness be present at trial for an actual cross-examination in order to admit prior testimony given under oath. . . . The test is the opportunity for a full and complete cross-examination rather than the use made of that opportunity." (Internal quotation marks omitted.)), cert. denied, 239 Conn. 941, 684 A.2d 712 (1996).

For the foregoing reasons, we reject the defendant's claim that the court improperly admitted B's prior deposition testimony into evidence in violation of our rules of evidence and his constitutional rights to confrontation and due process.

## II

The defendant also claims that his dual conviction of attempted murder and assault in the first degree, each of which was factually predicated on his having stabbed B, violated the constitutional prohibition against double jeopardy because, as a result of the

court's having permitted his conviction of both charges to stand, he effectively has been punished twice on the same evidence for the same offense. Although the defendant acknowledges that this claim was never raised before the trial court and, thus, is unpreserved, he nevertheless seeks appellate review pursuant to *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified in *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[23] We conclude that the claim is reviewable under *Golding* because it is of constitutional magnitude and the record is adequate for review. We conclude, however, that the defendant cannot demonstrate the existence of a constitutional violation, and, thus, his claim fails under the third prong of the *Golding* analysis.[24]

"The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. . . . The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy. . . .[25] This constitutional guarantee serves three separate functions: (1) It protects against a second prosecution for the same offense after acquittal. [2] It protects against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense [in a single trial]." (Citations omitted; footnote added; footnote omitted; internal quotation marks omitted.) *State* v. *Ferguson*, 260 Conn. 339, 360–61, 796 A.2d 1118 (2002). In the present appeal, the defendant's claim implicates the last of these three functions.

"The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden *only if both conditions are met.* . . . With respect to cumulative sentences imposed in a single trial, the [d]ouble [j]eopardy [c]lause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended. . . . [T]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. . . . On appeal, the defendant bears the burden of proving that the prosecutions are for the same offense in law and fact." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 361.

With respect to the first part of this two part process, "it is not uncommon that we look to the evidence at trial and to the state's theory of the case . . . in addition to the information against the defendant, as amplified

by the bill of particulars. . . . If it is determined that the charges arise out of the same act or transaction, then the court proceeds to [part two of the analysis], where it must be determined whether the charged crimes are the same offense. . . . At this second step, we [t]raditionally . . . have applied the *Blockburger* test[26] to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact [that] the other does not.[27] . . . In applying the *Blockburger* test, we look only to the information and bill of particulars—as opposed to the evidence presented at trial—to determine what constitutes a lesser included offense of the offense charged." (Citations omitted; footnotes added; internal quotation marks omitted.) *State* v. *Porter*, 328 Conn. 648, 662, 182 A.3d 625 (2018).[28] Stated differently, only "[i]f the elements of one offense as defined by the statute include the elements of a lesser offense; or if one offense is merely nominally distinct from the other" will double jeopardy attach. *State* v. *McCall*, 187 Conn. 73, 91, 444 A.2d 896 (1982).

The state does not dispute seriously the defendant's assertion that his conviction of both counts arose from the same act or transaction.[29] As the defendant correctly notes, with respect to the charges of attempted murder and assault in the first degree, the information alleged that those crimes involved the same victim, B, and had occurred on the same date, at the same time and at the same location. For purposes of our analysis, we will assume without deciding that the first step of the double jeopardy analysis is met and proceed directly to the second step of the analysis to determine if the charged crimes each contain a statutory element that the other does not. The state asserts that they do and cites to *State* v. *Sharpe*, 195 Conn. 651, 655, 491 A.2d 345 (1985), as controlling precedent holding that punishment for both assault in the first degree and attempted murder in the same prosecution does not violate double jeopardy. We agree with the state.

We begin by comparing the statutory elements of attempted murder and assault in the first degree to determine if each offense contains an element not contained in the other. Section 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does . . . anything . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ." Section 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ." Accordingly,

"[a] conviction for attempted murder requires proof of intentional conduct constituting a substantial step toward intentionally causing the death of another person." *State* v. *Sharpe*, supra, 195 Conn. 655.

By comparison, § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a . . . dangerous instrument . . . ." Looking at the elements of the two crimes, attempted murder requires proof that the defendant intended to cause the death of the victim, which is not an element of assault in the first degree, which requires only the intent to cause serious physical injury. Conviction for assault in the first degree requires proof that the defendant (1) seriously injured the victim (2) with a dangerous instrument. The state is not required to prove either of those elements to obtain a conviction for attempted murder. Mindful that a *Blockburger* analysis is technical in nature in that it requires us to focus only on the statutory elements and not on the evidence adduced at trial to prove those elements, we are compelled to conclude that attempted murder and assault in the first degree are not the same offense for purposes of double jeopardy.

Our conclusion is consistent with and controlled by our Supreme Court's decision in *State* v. *Sharpe*, supra, 195 Conn. 651. In *Sharpe*, the victim was in a vehicle, backing out of the driveway of his house, when the defendant approached the front of the vehicle, carrying a gun. Id., 653. He first fired a shot into the front of the vehicle that hit the victim, and then moved around to the driver's side of the car and fired five or six additional shots, further injuring the victim. Id., 653–54. The defendant was charged with both attempted murder in violation of §§ 53a-49 and 53a-54a (a) and with assault in the first degree in violation of § 53a-59 (a) (1), each predicated on his shooting of the victim. Id., 652. The court denied the defendant's pretrial motion that sought the dismissal of either the attempted murder charge or the assault charge on the grounds that they rose out of the same transaction and, thus, were "multiplicitous" and violated his right to be free from double jeopardy. Id., 654, 656 n.3.

On appeal, our Supreme Court rejected the defendant's double jeopardy claim, holding that it failed under the *Blockburger* test. Id., 655–56. The court stated: "A conviction for attempted murder requires proof of intentional conduct constituting a substantial step toward intentionally causing the death of another person. . . . No showing of actual injury is required. Conversely, a conviction for assault in the first degree requires proof that the defendant actually caused serious physical injury to another person. No showing of intent to cause death is necessary. Therefore, each

offense requires proof of a fact which the other does not. Consequently, the statutory violations charged, attempted murder and assault in the first degree, are not the same offense for double jeopardy purposes. This conclusion disposes of the defendant's argument that he was subjected to double jeopardy by being punished twice upon the same evidence and essentially the same offense. He was not twice punished for the same crime." (Citation omitted; footnote omitted.) Id.

This court previously has relied on the holding in *Sharpe* to reject a claim that charges of attempted murder and assault in the first degree by means of a dangerous instrument with respect to the actions of a single defendant against a single victim in the same transaction are the same offense for double jeopardy purposes under the *Blockburger* test. See *State* v. *Glover*, 40 Conn. App. 387, 391–92, 671 A.2d 384, cert. denied, 236 Conn. 918, 673 A.2d 1145 (1996). In *Glover*, as in *Sharpe* and the present case, "the information charged the defendant with committing both crimes in the same place at the same time." Id., 391.

Although the defendant attempts to distinguish the outcome in *Sharpe* from the present action, his arguments are unavailing. *Sharpe* remains good law and is binding authority under the facts of the present case as it pertains to the defendant's double jeopardy claim. The defendant argues that the holding in *Sharpe* "cannot be baldly applied to every double jeopardy claim premised on concomitant convictions of attempted murder and assault in the first degree." In support of this argument, the defendant attempts to attach far too great significance to language from another case that relied on *Sharpe*, suggesting that the outcome of the *Blockburger* analysis in that case turned on the defendant's concession that the attempted murder and assault were charged as separate offenses rather than as "offenses standing in a greater-lesser relationship." *State* v. *Gilchrist*, 24 Conn. App. 624, 629, 591 A.2d 131, cert. denied, 219 Conn. 905, 593 A.2d 131 (1991); see also *State* v. *McCall*, 187 Conn. 73, 91, 444 A.2d 896 (1982) (similar concession made by defendant). The defendant clarifies that, in the present case, he is expressly asserting that "the [two] charges . . . stand in the relation of greater to lesser included offenses."

By definition, however, "[a] lesser included offense is one that does not require proof of elements beyond those required by the greater offense." (Internal quotation marks omitted.) *State* v. *Johnson*, 316 Conn. 34, 44, 111 A.3d 447 (2015). Because, as we already have explained, a conviction for assault in the first degree requires proof of actual serious physical injury whereas attempted murder requires no such proof, by definition, assault in the first degree cannot be a lesser included offense of attempted murder.

Furthermore, the defendant has pointed us to nothing

in the present record that would support the novel legal theory he advances, which stands counter to traditional *Blockburger* analysis. The operative information in this case charged attempted murder and assault in the first degree by way of two separate and distinct counts. Despite the allegations that the crimes were committed contemporaneously, nothing in the language of those counts reasonably can be construed as evincing any intent on the part of the state to charge the defendant in the alternative. The counts were not pursued by the state at trial in an alternative manner nor was such a theory discussed in closing argument. No instruction was requested by the defendant, nor was any instruction given to the jury, indicating that it should consider the charges only "as standing in a greater-lesser relationship."[30] Although certainly not dispositive by itself, the defendant's failure to raise the double jeopardy claim that he now advances either by way of a pretrial motion to dismiss or postconviction belies any implication that the double jeopardy claim was obvious on the face of the information or the manner in which the case was charged.

Because we have concluded that attempted murder and assault in the first degree are not the same offense under a traditional *Blockburger* analysis, the defendant can only prevail on his double jeopardy claim by making a showing that the legislature intended to preclude multiple punishments for those crimes. The defendant, who has the burden of proof on that issue; *State* v. *Alvaro F.*, 291 Conn. 1, 13, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009); has advanced nothing from which to discern any legislative intent to preclude prosecution of a criminal defendant for both assault in the first degree and attempted murder. The defendant has not directed us to any statutory language or other evidence from which we could discern a clear legislative intent to preclude a conviction as occurred in the present case. Accordingly, the defendant's double jeopardy claim fails.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the defendant or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

** The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] For clarity, we discuss the defendant's claims in the reverse order in which they were briefed.

[2] In addition to being the father of S, the defendant was the father of three other children from relationships with two different women.

[3] B testified that she remembered asking the defendant what he was doing but that she had no further memories of what transpired immediately after she came upon the defendant and N. Her next recollection of events was being on the floor with the defendant thrusting something into her lower back.

[4] One of the landlords testified at trial that she was awoken at about 2 a.m. by noises and heard B saying, "Oscar, no, she's my friend." She also reported later hearing the shower running.

[5] According to the autopsy report admitted at trial, N was stabbed seven times in the neck. Her carotid artery was completely severed, causing her death. The toxicology report showed that she had a blood alcohol content of 0.142.

[6] B suffered substantial injuries to both her neck and abdomen. Many of the muscles and nerves on the left side of her neck were completely severed. Her abdominal wound ran from her right kidney past her spine and into her liver. When she arrived at the hospital, she had lost between 40 and 50 percent of her blood and was in shock. According to her treating physician, she had a number of severe defensive wounds on both of her hands. The doctor described her left thumb as "dangling" and her right pinkie finger as having been "nearly amputated . . . ."

[7] Norris had removed a photograph of the defendant and S from the bedroom of the apartment, which was used as part of the information provided for the Amber Alert.

[8] The police observed that a chair also had been placed over N's body.

[9] We note that, although the defendant filed a pretrial motion to dismiss, he did not raise double jeopardy as an issue in that motion or in his later oral motions for a judgment of acquittal.

[10] The state charged the defendant under the situational prong of the risk of injury statute. Its theory with respect to that charge was that, given the bloody and violent incident that transpired in the living area of the small apartment, there was a grave risk that, if S had awoken and walked out into the room, she would have been exposed to and potentially endangered by the defendant's violent conduct. In addition, by later removing S from the apartment, the defendant necessarily would have carried her through the bloody crime scene, exposing her to the risk of psychic harm.

[11] According to the defendant's testimony, N and B were both intoxicated when they picked him up from work. When they returned to the Bridgeport apartment after he visited his son, B had initiated the plan to go out and, although N asked him to join them, he chose to stay home to watch S. The defendant testified that, when N and B returned from the club, he declined N's invitation to drink more beer with them, choosing to listen to music on his phone in the bedroom. He claimed that, at some point, N called him into the living room and told him that B had accused him of breaking her cell phone. He claimed that the three began to argue. When the argument began "escalating," N purportedly grabbed his hand to take him to the bathroom to speak to him away from B, at which point she referred to B as a slut and accused B of being ungrateful for them allowing her to move in with them. B allegedly overheard this, including the reference to her being a slut, and responded that at least she was single whereas N was also a slut despite living with the defendant. Although the defendant stated that he construed B's statement as a confirmation of his belief that N was cheating on him, he claimed that he saw no point in discussing this with N at that time because she was intoxicated and, instead, he chose to return to the bedroom and resume listening to music.

At some point, he claimed, he heard bottles crashing in the living room, and, when he came out of the bedroom to investigate, he found N "holding a knife, she was all bloody—and she was leaning on the stove holding a knife . . . ." According to the defendant, B was standing by the refrigerator also covered in blood. Despite this purported evidence of a brutal fight between the two women, the defendant maintained that he never heard any shouts or screams, only the sound of the bottles crashing. According to the defendant, he moved toward N to take away the knife but slipped in blood that was all over the floor. When he fell to the floor, B supposedly first struck him in the back of the head with a plate or bottle, and then "threw herself on top" of him. He claims that it was at this point that he realized that B also had a knife. He allegedly was able to get the knife from B, who continued to hit him in an effort to get the knife back. According to the defendant, he was eventually able to repel B, and, when he got to his feet, he saw N lying on the floor, unresponsive. When he returned his attention back to B, she also was on the floor and unresponsive. At that time, the defendant claimed, he looked in on S, who was still sleeping. He claimed that, when he returned to the living room and found the women still unconscious, he contemplated calling the police but feared they would blame him. Instead, he decided to take a shower, so that his daughter would not have to see him covered in blood when he woke her up, and thereafter fled the apartment. In sum, the defendant denied ever stabbing N, or intentionally stabbing B, insisting that B had "injured herself when she was attacking [him], when [he] had a knife in [his] hand."

[12] Specifically, the court sentenced the defendant as follows: fifty years for the murder conviction with a concurrent twenty year sentence on the attempted murder count; twenty years for the assault conviction, five of which was a mandatory minimum, to run consecutively to the other sentences; and an additional five year consecutive sentence on the risk of injury count.

[13] The state contends that we should decline to review this claim because, although the defendant challenged the admission of B's deposition at trial, he did so on a different basis than the one advanced on appeal, and, therefore, the defendant's claim is unpreserved. According to the state, the defendant's objection at trial was limited to the state's alleged failure to establish that B actually was in Guatemala. Our review of the trial transcript convinces us, however, that the defendant's argument was not so narrowly confined. Part of the objection raised by the defendant at trial more broadly encompassed the state's general failure to exercise due diligence in securing B's trial testimony, which certainly included allegedly doing nothing to verify her whereabouts. For example, part of the defendant's argument to the trial court was that, "[w]hen the state's attorney's office wants individuals to come back and testify, as the court knows, they can be fairly persuasive . . . ." We construe this as an argument that the state could have done more to entice B to return voluntarily. Accordingly, we are satisfied that the present claim was adequately preserved for appellate review.

[14] The court concluded that the state lacked the legal authority to subpoena an individual residing in Guatemala, and the defendant does not challenge this determination on appeal.

[15] The state responded as follows to the defendant's argument: "[W]e actually moved for deposition because we had a reasonable belief, but nothing firm, that she might not have been—I don't—I never saw any documents, is what I'm saying—that she might not have been a citizen of the United States. In which case, there would have been a possibility that she could have been made unavailable by some other process. Also, there's no obligation for a witness to stay in the country. You know, unless we secured a material witness warrant against them, and—and lodged them in jail. And that would be the—the only way that we would do that. And that's an unusual procedure."

[16] Section 8-6 of the Connecticut Code of Evidence provides in relevant part:

"The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding, provided (A) the issues in the former hearing are the same or substantially similar to those in the hearing in which the testimony is being offered, and (B) the party against whom the testimony is now offered had an opportunity to develop the testimony in the former hearing. . . ."

The commentary to § 8-6 provides in relevant part: "The proponent of evidence offered under Section 8-6 carries the burden of proving the declarant's unavailability. . . . To satisfy this burden, the proponent must show that a good faith, genuine effort was made to procure the declarant's attendance by process or other reasonable means. . . . [S]ubstantial diligence is required . . . but the proponent is not required to do everything conceivable to secure the witness' presence. . . . A trial court is not precluded from relying on the representations of counsel regarding efforts made to procure the witness' attendance at trial if those representations are based on counsel's personal knowledge. . . ." (Citations omitted; internal quotation marks omitted.) Conn. Code Evid. § 8-6, commentary.

[17] At the time B was deposed, the parties had agreed that B's deposition testimony would be subject to impeachment at trial to the same degree as if it were live testimony. The state brought this to the trial court's attention at the time it ruled on the admissibility of B's videotaped deposition, stating as follows:

"[The Prosecutor]: I just would note in passing, for the record, that, under [§] 8-8 of the Code of Evidence, that impeachment and supporting credibility of a hearsay declarant may be done to the same extent as if it was live testimony. So that, for example, inconsistent statements—

"The Court: Inconsistent statement.

"[The Prosecutor]: —and extrinsic impeachment for bias, motive, interest in the outcome of the case, et cetera, can still be introduced against her; even though there's no opportunity to confront her with it, it can be introduced.

"The Court: For the jury's consideration of that witness.

"[The Prosecutor]: Yes."

The defendant did not indicate to the court at that time that he intended to introduce any impeachment evidence and expressly declined an invitation to do so after the videotaped testimony was played for the jury.

[18] In *Lebrick*, our Supreme Court instructed that courts in this state, in considering whether a witness is "unavailable" for purposes of the former testimony exception to the hearsay rule under our Code of Evidence, should follow the definition of "unavailable" used by federal courts in the Federal Rules of Evidence. *State* v. *Lebrick*, supra, 334 Conn. 507.

[19] The state knew that the witness was a New York City resident, but when it tried to contact her at about the time that jury selection had begun to secure her testimony at trial, it was unable to reach her at her last known address and telephone number. *State* v. *Lebrick*, supra, 334 Conn. 500–501. An investigator for the state unsuccessfully searched several state and federal databases for a current address or phone number, eventually discovering two addresses associated with the witness in New York and several phone numbers. Id. The investigator called the phone numbers, "but two were not in service, and one was not receiving phone calls." Id., 501. The state nonetheless prepared an interstate summons that was sent by e-mail to the Kings County District Attorney's Office in New York City. Id. The e-mail contained the addresses the state had discovered in its electronic search as well as the last known address of the witness' mother in Brooklyn, New York. Id. An investigator with the district attorney's office attempted to serve the summons at the addresses provided; he was not tasked with conducting an independent investigation into the witness' whereabouts and did not undertake such a task on his own initiative. Id. The investigator visited the addresses he was provided, including twice visiting the address for the witness' mother but was unable to locate the witness. Id., 501–502. He also never encountered anyone whom he was able to question regarding the witness' location. Id., 502. His attempts to contact the witness by phone at the numbers provided by the state also proved unsuccessful. Id., 501–502.

[20] We are cognizant that the court in *Morquecho* applied the now defunct abuse of discretion standard; see *State* v. *Morquecho*, supra, 138 Conn. App. 862; rather than the more exacting plenary review established by our Supreme Court in *Lebrick*. See *State* v. *Lebrick*, supra, 334 Conn. 507. Nonetheless, the court's discussion in *Morquecho* remains instructive in evaluating the state's efforts in the present case.

[21] The Supreme Court in *Mancusi* granted certiorari from a ruling by the United States Court of Appeals for the Second Circuit. *Mancusi* v. *Stubbs*, 404 U.S. 1014, 92 S. Ct. 671, 30 L. Ed. 2d 661 (1972). The Second Circuit had stated that the witness' absence from the United States was not "per se a sufficient reason to broaden the exception to the [c]onfrontation [c]lause allowing the admission of prior testimony of a presently unavailable witness. Although there is a much greater chance that it will not be possible to bring before the court a witness residing abroad, the possibility of a refusal is not the equivalent of asking and receiving a rebuff." (Internal quotation marks omitted.) *United States ex rel. Stubbs* v. *Mancusi*, 442 F.2d 561, 563 (2d Cir. 1971), rev'd, *Mancusi* v. *Stubbs*, 408 U.S. 204, 92 S. Ct. 2308, 33 L. Ed. 2d 293 (1972). The Second Circuit's conclusion that the state had failed to meet its burden of establishing due diligence appears to have turned on the fact that the record contained no evidence that the state ever asked the witness whether he would be willing to voluntarily return and testify. In reversing the judgment of the Second Circuit, the Supreme Court's decision implicitly rejected the Second Circuit's reasoning that, to establish due diligence in procuring the attendance of a witness located outside of the United States, a state cannot solely rely on the witness' absence but must, at a minimum, also produce evidence demonstrating that it sought the witness' voluntary attendance and that that request was rejected. Nevertheless, in the present case, there was testimony presented at trial that the state had asked Peche to determine on its behalf whether B would be willing to return and that B had indicated that she would not be willing to return to the jurisdiction. Accordingly, even the more exacting standard applied by the Second Circuit would be met in the present case.

[22] We note that, since *Mancusi* was decided, relevant federal statutes have been amended and now permit a state to seek a subpoena of a *United States citizen* residing abroad. See 28 U.S.C. § 1783 (a) (2018). These changes do not affect *Mancusi*'s holding, however, with respect to a foreign national, such as in the present case. In the absence of a treaty or federal statute, a foreign citizen is simply outside the subpoena power of the state.

[23] *Golding* provides that "a defendant can prevail on a claim of constitu-

tional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (eliminating *Golding*'s use of "clearly" in describing requirements under third prong of test).

[24] Although, in its appellate brief, the state primarily responds to the merits of the defendant's double jeopardy claim, in a lengthy footnote at the end of its double jeopardy analysis, the state also argues that we should treat the defendant's failure to raise his double jeopardy claim at trial as an implied waiver of any double jeopardy protection. In support of that argument, the state notes that appellate courts in this state have relied on waiver to resolve unpreserved double jeopardy claims arising in the context of a successive prosecution; see, e.g., *State* v. *Ledbetter*, 240 Conn. 317, 325–26, 692 A.2d 713 (1997); *State* v. *Belcher*, 51 Conn. App. 117, 122–23, 721 A.2d 899 (1998); but nonetheless have afforded *Golding* review to unpreserved double jeopardy claims arising in the course of a single trial without providing any analysis to explain this apparently disparate treatment of similar claims. See, e.g., *State* v. *Chicano*, 216 Conn. 699, 704, 584 A.2d 425 (1990), overruled in part on other grounds by *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013); see also *State* v. *Barber*, 64 Conn. App. 659, 671, 781 A.2d 464 ("[i]f double jeopardy claims arising in the context of a single trial are raised for the first time on appeal, these claims are reviewable" (internal quotation marks omitted)), cert. denied, 258 Conn. 925, 783 A.2d 1030 (2001).

The state also argues in the same footnote that the defendant's failure to raise his double jeopardy concern at trial unfairly prejudiced the state and potentially resulted in an inadequate record for review on appeal because, if the state had known of the double jeopardy claim at trial, it might have marshaled the evidence differently or made additional arguments to the jury. Specifically, the state notes that, given the multiple injuries to B, it could have argued that "the defendant initially attacked B with an intent to inflict serious physical injury and then, prior to thrusting an object in her neck after she came to on the floor and begged for her life, engaged in a separate act of attempted murder."

As discussed in this part of the opinion, the defendant's claim fails on its merits under established precedent and, therefore, he cannot demonstrate the existence of a constitutional violation as alleged on the basis of the facts in the record on which he relies. Consequently, we elect not to resolve these alternative arguments advanced by the state.

[25] The Connecticut constitution does not contain an express prohibition against double jeopardy, but the due process guarantees of article first, § 8, of the constitution of Connecticut have been interpreted to include a protection against double jeopardy. See *State* v. *Michael J.*, 274 Conn. 321, 349–50, 875 A.2d 510 (2005). The scope of this state constitutional protection consistently has been construed to mirror, rather than to exceed, the protection afforded under the federal constitution. Id.

[26] See *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

[27] Both our Supreme Court and the United States Supreme Court have clarified that the *Blockburger* test, which also is referred to as the "*same-elements*" test, "inquires whether each offense contains *an element* not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." (Emphasis added.) *United States* v. *Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993). In *State* v. *Bernacki*, 307 Conn. 1, 21–22, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013), our Supreme Court emphasized that it is irrelevant for purposes of a *Blockburger* analysis "that the state may have relied on the same evidence to prove that the elements of both statutes were satisfied"; id., 21; and that proper application of the *Blockburger* test looks at whether "each statute contains a different *statutory element* requiring proof of a fact that the other does not . . . ." (Emphasis added.) Id., 22. The court further noted that "emphasis on the conduct at issue, rather than purely on the statutory language and charging instruments, is not consistent with our well established case law holding that the *Blockburger* analysis is theoretical in nature and not dependent on the actual evidence adduced at trial." Id., 21 n.16.

[28] As our Supreme Court has stated, the *Blockburger* test is, at its core, a rule of statutory construction, and "because it serves as a means of discerning [legislative] purpose the rule should not be controlling [if], for example, there is a clear indication of contrary legislative intent. . . . Thus, the *Blockburger* test creates only a rebuttable presumption of legislative intent, [and] the test is not controlling [if] a contrary intent is manifest. . . . [If] the conclusion reached under *Blockburger* is that the two crimes do not constitute the same offense, the burden remains on the defendant to demonstrate a clear legislative intent to the contrary." (Citations omitted; internal quotation marks omitted.) *State* v. *Alvaro F.*, 291 Conn. 1, 12–13, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175 L. Ed. 2d 140 (2009).

[29] To the extent that the state suggests in a footnote in its brief that the jury reasonably could have viewed the evidence at trial as supporting a conclusion that the defendant engaged in separate acts for which separate punishment would be permissible; see footnote 24 of this opinion; without additional briefing of the issue, the state's brief is inadequate to raise any challenge to whether the defendant's double jeopardy claim fails under the " 'same act or transaction' " prong of double jeopardy analysis. See *State* v. *Ferguson*, supra, 260 Conn. 361.

[30] The defendant relies on this court's analysis in *State* v. *Tinsley*, 197 Conn. App. 302, 232 A.3d 86, cert. granted, 335 Conn. 927, 234 A.3d 979 (2020), to support his insistence that assault in the first degree should be treated as a lesser included offense of attempted murder. In *Tinsley*, the defendant was convicted of both manslaughter in the first degree and risk of injury to a child on the basis of his having brutally beaten a fifteen month old child, who later died of his injuries. Id., 304–306. This court found that each of those statutes contained an element that the other does not and thus were not the same offense under a traditional *Blockburger* analysis. Id., 323. Nevertheless, the court agreed with the position advanced by the defendant that the dual convictions still violated double jeopardy if it was not possible to commit the greater offense in the manner described in the information without having first committed the lesser offense. Id., 324–25. The court determined that, "one cannot cause the death of another in the manner described in the information, without first inflicting trauma to the victim's body, which is an act likely to impair the health of the minor victim." Id., 323. The court in *Tinsley* held, on the basis of that determination, that "risk of injury to a child is a lesser included offense and, thus, the same offense for purposes of double jeopardy, as manslaughter in the first degree." Id.

To the extent that the defendant asks us to follow the alternative analytical path utilized by this court in *Tinsley*, we decline to expand *Tinsley*'s holding beyond the precise circumstances of that case. Whereas our Supreme Court's analysis in *Sharpe* is essentially "on all fours" with the present case because the same statutory crimes were at issue, the court in *Tinsley* was comparing simultaneous convictions of charges of risk of injury and manslaughter, neither of which is implicated in the present case.

_____