******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* RYAN E. RAGALIS
## (AC 46652)

Moll, Suarez and Seeley, Js.

*Syllabus*

Convicted of various crimes in connection with a motor vehicle accident involving a pedestrian, the defendant appealed to this court. The defendant claimed, inter alia, that his conviction of assault in the second degree with a motor vehicle and assault in the second degree, arising from a single occurrence, violated the double jeopardy clause of the fifth amendment to the United States constitution and the Connecticut constitution. *Held*:

The defendant could not prevail on his claim that there was insufficient evidence to convict him of assault in the second degree with a motor vehicle and assault in the second degree, as the state adduced ample evidence for the jury to reasonably conclude that the state had proven beyond a reasonable doubt that the defendant was the operator of the vehicle that struck the victim, that the defendant's intoxication caused the victim's injuries, and that the victim suffered serious physical injuries.

The defendant's conviction of assault in the second degree with a motor vehicle and assault in the second degree did not violate double jeopardy because the defendant failed to establish a clear legislative intent to treat the relevant statutes (§§ 53a-60 (a) (3) and 53a-60d) as one offense for double jeopardy purposes pursuant to *Blockburger* v. *United States* (284 U.S. 299), as the statute and the information on each charge at issue required proof of elements that the statute and the information on the other charge did not, neither statute refers to the other, each statute sets a different penalty, and the statutes have distinct purposes, and the fact that the same evidence was used to establish that the defendant committed each crime was irrelevant.

The trial court's supplemental instruction to the jury in response to a note it received regarding whether "serious physical injury" to the victim must be long-term did not mislead the jurors, as the court answered the jury's question and that answer was correct in law, the court did not state that permanence was not a factor that the jury could consider in determining whether the victim sustained a serious physical injury, and the court referred the jury to its original instructions, a copy of which was in the jury's possession, and those instructions provided the correct definition of "serious physical injury."

Argued April 15—officially released October 7, 2025

Two part substitute information charging the defendant, in the first part, with the crimes of operating a motor vehicle while under the influence of intoxicating liquor or drugs, assault in the second degree with a motor vehicle, assault in the second degree, and evasion of responsibility in the operation of a motor vehicle, and, in the second part, with the crime of operating a motor vehicle while the operator's license was under suspension, brought to the Superior Court in the judicial district of New London, where the first part of the information was tried to the jury before *K. Murphy, J.*; verdict of guilty of operating a motor vehicle while under the influence of intoxicating liquor or drugs, assault in the second degree with a motor vehicle, and assault in the second degree; thereafter, the second part of the information was tried to the court, *K. Murphy, J.*; finding of guilty; subsequently, the defendant was presented to the court, *K. Murphy, J.*, on a plea of guilty to having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor or drugs; judgment of guilty in accordance with the verdict and the finding, and sentence enhanced in accordance with the plea, from which the defendant appealed to this court. *Affirmed.*

*Kayla R. Stephen*, deputy assistant public defender, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Paul Narducci*, state's attorney, and *David J. Smith*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

SUAREZ, J. The defendant, Ryan E. Ragalis, appeals from the judgment of conviction, rendered following a jury trial, of assault in the second degree with a motor

vehicle in violation of General Statutes § 53a-60d[1] and assault in the second degree in violation of General Statutes § 53a-60 (a) (3).[2] On appeal, the defendant claims that (1) the evidence was insufficient to convict him of assault in the second degree with a motor vehicle and assault in the second degree, (2) his conviction of assault in the second degree with a motor vehicle and assault in the second degree violates the double jeopardy clause of the United States constitution, and (3) the trial court's supplemental instructions to the jury in response to a note misled the jury.[3] We affirm the judgment of the trial court.

On the basis of the evidence presented, the jury reasonably could have found the following facts. On the evening of June 16, 2019, Bethany Billing (victim), was at Pizzetta, a restaurant and bar located on Water Street in Mystic, with friends. The victim and her friend, Jessica Clapper, left Pizzetta and walked across the street. Shortly after midnight, while walking back to Pizzetta,

---

[1] General Statutes § 53a-60d (a) provides: "A person is guilty of assault in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes serious physical injury to another person as a consequence of the effect of such liquor or drug."

[2] General Statutes § 53a-60 (a) provides in relevant part: "A person is guilty of assault in the second degree when . . . (3) the actor recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument . . . ."

[3] The jury also found the defendant guilty of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes § 14-227a. Thereafter, the defendant pleaded guilty to the charge in the state's part B information of having previously been convicted of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14-227a as a repeat offender. Following a trial to the court, the defendant also was found guilty of operating a motor vehicle while his operator's license was under suspension in violation of General Statutes § 14-215 (c). The defendant does not challenge his conviction of these offenses on appeal.

The defendant also was charged with one count of evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (b) (1). The jury found him not guilty of that charge.

Clapper saw a vehicle stopped in front of another restaurant farther down the street. Clapper and the victim began to cross the street,[4] when Clapper felt a "swoosh" and saw the victim's body being thrown in front of Pizzetta by a vehicle. At the time of the impact, Clapper and the victim were on the side of the roadway closest to Pizzetta.

An eyewitness to the Water Street accident (first accident),[5] Patrick Scheurer, was working that night as a bouncer at a bar located diagonally across the street from Pizzetta. Scheurer was sitting outside the bar when he heard an engine "rev." He looked down the street and saw a dark sedan back up, nearly hitting another vehicle, and then slam on its brakes. He observed the vehicle driving forward down the street, hitting the victim and leaving the scene.

Jose Cepeda-Grullon, an Uber driver, was driving toward Pizzetta when he first observed the vehicle that struck the victim.[6] Cepeda-Grullon saw the vehicle back up out of a parking lot, almost hitting his vehicle. After Cepeda-Grullon honked his horn, the vehicle began accelerating forward. Cepeda-Grullon continued to drive forward, following the other vehicle, and saw two women crossing the street, heading toward Pizzetta. He

---

[4] Clapper and the victim did not cross the street in a crosswalk. Clapper had been drinking alcohol on the night of the accident. Although the victim did not have any memory of the accident, Officer Brenna Bolduc of the Groton Police Department, who responded to the scene, testified at trial that she had noted in her police report that the victim was most likely intoxicated.

[5] As will be discussed in greater detail in this opinion, shortly after the victim was struck on Water Street, the defendant was involved in an accident in Stonington, in which he was found in a vehicle that had hit a fence and crashed into a tree. For clarity, we refer to the accident involving the victim that occurred in Mystic as the "first accident," and to the accident that occurred subsequently in Stonington as the "second accident."

[6] At various points during the trial, Cepeda-Grullon was referred to as Cepeda.

then saw the vehicle strike the victim with the right side of its bumper and leave the scene.

Police officers quickly arrived at the scene of the first accident. Lieutenant Anthony LaFleur of the Groton Police Department collected evidence, including the plastic casing for a vehicle mirror that was later found to be from the defendant's vehicle. Video surveillance footage was acquired from the area of the accident. The footage shows two females walking down Water Street and then crossing the street toward Pizzetta. Subsequently, the footage shows a dark colored vehicle, similar to the vehicle in which the defendant was later found at the scene of a second accident in Stonington (second accident), striking one of the females and leaving the scene. The footage depicts Cepeda-Grullon's vehicle following the dark colored vehicle from the first accident scene.

As Cepeda-Grullon pursued the vehicle, he lost sight of it twice. Before Cepeda-Grullon lost sight of the vehicle the second time, he saw the vehicle on the left side of the road. At first, he passed the vehicle. At this time, however, Cepeda-Grullon was on the phone with a 911 operator, who instructed him to go back to the location where he had seen the vehicle on the left side of the road. He arrived at the second accident scene less than two minutes later. By the time he arrived, the vehicle had hit a fence and crashed into a tree, facing oncoming traffic. Cepeda-Grullon told the police that he saw only one individual in the vehicle, in the driver's seat.[7] He described the individual as a younger white male with short dark hair and a black beard.[8]

---

[7] Although Cepeda-Grullon testified at trial that he never saw the defendant exit his vehicle, Groton Police Officer Shawn Paradis testified that Cepeda-Grullon had told him that he did see the defendant exit the vehicle.

[8] Cepeda-Grullon's physical description of the individual in the vehicle was consistent with video footage taken from the body camera of Officer Shawn Paradis of the Groton Police Department, which depicts the defendant at the scene of the second accident and at the hospital.

Shortly after the first accident in Mystic, the police responded to the scene of the second accident in Stonington. Police officers and emergency personnel removed the individual, who later was identified by Officer Shawn Paradis of the Groton Police Department as the defendant, from the vehicle. The defendant's identification was found inside the vehicle. A DNA profile produced from a swab of the passenger side door of the defendant's vehicle was later found to match a known DNA profile from the victim. At the scene of the second accident, the defendant exhibited aggression and slurred speech.

The defendant was taken from the scene of the second accident to Lawrence + Memorial Hospital by ambulance. Paradis followed in his police cruiser. At the hospital, the defendant became combative and had to be restrained. The defendant appeared intoxicated at the hospital. Paradis, who assisted the staff in restraining the defendant, smelled alcohol on the defendant and noted that his eyes were bloodshot, red, and glossy.[9] Paradis also observed that the defendant lacked coordination when trying to stand and saw the defendant swaying while sitting up in his bed. Blood tests revealed that the defendant had an elevated blood alcohol content of 0.27.

The victim was also transported to Lawrence + Memorial Hospital from the scene, where she was intubated and admitted to the intensive care unit. She stayed at the hospital for more than one week. The victim exhibited severe confusion at the hospital. As a result of the accident, the victim was diagnosed with a closed head injury, fractures to her neck, back, pelvis, and teeth, and required a total of twenty-five staples to

---

[9] The police did not perform field sobriety tests of the defendant at the scene of the second accident, but Paradis observed that the defendant exhibited nystagmus, which Paradis testified is the "bouncing . . . involuntary control of [one's] eyes" and is indicative of intoxication.

repair scalp lacerations. She also had a broken nose, numerous scrapes and abrasions, and received stitches in her chin. After being discharged, the victim had extensive dental work to repair her teeth. She required medical treatment for six or seven months thereafter. For approximately three months, the victim had to live with her parents because she was not able to care for herself. The victim testified that, as of the time of trial, she continued to have problems with her short-term memory, as well as constant neck and lower back pain.

The defendant subsequently was arrested and charged in a substitute information containing two parts. In the first part, the defendant was charged with operating a motor vehicle while under the influence of alcohol or drugs, assault in the second degree with a motor vehicle, assault in the second degree, and evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (b) (1). He was charged, in the second part, with operating a motor vehicle while his operator's license was under suspension. The defendant was also charged in a separate part B information with previously having been convicted of operating a motor vehicle while under the influence of alcohol or drugs in violation of General Statutes § 14-227a.

The first part of the operative information was tried to the jury. At trial, the state presented testimony from several witnesses, including, inter alia, Clapper, Scheurer, Cepeda-Grullon, the victim, the victim's mother, and the investigating officers. On the first day of trial, Groton Police Officer Brenna Bolduc testified regarding her response to the first accident scene. She was dispatched at approximately 12:15 a.m. and, upon arrival, saw the victim lying on the sidewalk adjacent to Water Street. Bolduc followed the ambulance that transported the victim to the hospital, where Bolduc also encountered the defendant, whom she described as "hostile . . . ." The next day, Bolduc was recalled by the state

and testified regarding her training and experience as a "drug recognition expert."[10] Bolduc testified regarding the effects of a person who is under the influence of alcohol, including its effects on a person's ability to perceive events and to operate a motor vehicle. She also testified that "alcohol is considered a central nervous system depressant. So, under that category of drugs, it would slow your central nervous system and cause slow motor skills and slower functioning."

After the prosecutor rested the state's case-in-chief, defense counsel made an oral motion for judgment of acquittal on all counts, which the court denied. Thereafter, the defense presented testimony from Captain Gregory J. McCarthy, Groton Police Department's shift commander at the time of the accident. When asked by defense counsel why an accident reconstruction was not completed at the scene of the first accident, McCarthy testified that there were not any skid marks, yaw marks, or other vehicles on the roadway and that, "[w]ithout skid marks or yaw marks or a vehicle at the scene, you cannot truly place the vehicle right there and . . . make measurements . . . ."

The jury found the defendant guilty of operating a motor vehicle while under the influence, assault in the second degree with a motor vehicle, and assault in the second degree, but not guilty of evasion of responsibility. The defendant thereafter pleaded guilty to the charge in the part B information, and the court found the defendant guilty of operating a motor vehicle while his operator's license was under suspension. On April 27, 2023, the defendant filed a motion to set aside the verdict, which the court denied on May 1, 2023. On May 1, 2023, the court sentenced the defendant to a total

---

[10] Bolduc testified that a drug recognition expert is a person who has "received advanced training and . . . [has] the ability to use a scientifically validated process to determine if somebody is under the influence of a drug."

effective term of fifteen years of incarceration, suspended after twelve years, one year of which was mandatory, followed by five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that there was insufficient evidence to convict him of assault in the second degree with a motor vehicle and assault in the second degree. Specifically, he argues that there was insufficient evidence that (1) he was the operator of the motor vehicle that struck the victim, (2) his alleged intoxication caused the victim's injuries, and (3) the victim suffered serious physical injuries. We disagree.

We begin our analysis with well settled legal principles governing our review of evidentiary sufficiency claims, including our standard of review. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the

defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"[P]roof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Rosa*, 233 Conn. App. 211, 217–18, 338 A.3d 1207 (2025), petition for cert. filed (Conn. June 26, 2025) (No. 240414).

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Calabrese*, 279 Conn. 393, 402–403, 902 A.2d 1044 (2006).

A

The defendant first argues that there was insufficient evidence to establish that he was the operator of the motor vehicle that struck the victim. We are not persuaded.

Counts two and three of the operative substitute information charged the defendant with assault in the second degree with a motor vehicle and assault in the second degree on factual allegations that the defendant, "while operating a motor vehicle under the influence of intoxicating liquor . . . cause[d] serious physical injury to . . . [the victim], as a consequence of the effects of such liquor and drugs," and "recklessly cause[d] serious physical injury to . . . [the victim] by means of a dangerous instrument."[11] To convict a defendant of assault in the second degree with a motor vehicle, the state must prove that the defendant, "while operating a motor vehicle under the influence of intoxicating liquor or any drug or both . . . causes serious physical injury to another person as a consequence of the effect of such liquor or drug." General Statutes § 53a-60d (a). Because operating a motor vehicle is an essential element of the crime of assault in the second degree with a motor vehicle, "that element must be proven beyond a reasonable doubt." *State* v. *Teti*, 50 Conn. App. 34, 39, 716 A.2d 931, cert. denied, 247 Conn. 921, 722 A.2d 812 (1998). A person "operates a motor vehicle within the meaning of § 14-227a (a) (2) when in the vehicle he intentionally does any act or makes use of any mechanical or electrical agency [that] alone or in sequence will set in motion the motive power of

---

[11] A motor vehicle qualifies as a "dangerous instrument" under § 53a-60 (a) (3). See General Statutes § 53a-3 (7) (" '[d]angerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury, and includes a 'vehicle' as that term is defined in this section"); see also, e.g., *State* v. *Rios*, 171 Conn. App. 1, 26, 156 A.3d 18, cert. denied, 325 Conn. 914, 159 A.3d 232 (2017). At trial, the evidence offered to prove that the defendant operated a motor vehicle under § 53a-60d was the same evidence offered to prove that he used a dangerous instrument to cause the victim's injuries under § 53a-60 (a) (3). We conclude, for the reasons stated in this opinion, that there was sufficient evidence to demonstrate that the defendant operated a motor vehicle under § 53a-60d and that he utilized a dangerous instrument for purposes of § 53a-60 (a) (3).

the vehicle." (Internal quotation marks omitted.) Id., 38. We interpret the meaning of the term "operating" in § 53a-60d similarly in the present case. Moreover, to convict a defendant of assault in the second degree under § 53a-60 (a) (3), the state must prove that the defendant "recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument . . . ." Accordingly, the use of a deadly weapon or dangerous instrument is an essential element of assault in the second degree. See, e.g., *State* v. *Chapman*, 46 Conn. App. 24, 33–34, 698 A.2d 347, cert. denied, 243 Conn. 947, 704 A.2d 800 (1997), cert. denied, 523 U.S. 1063, 118 S. Ct. 1393, 140 L. Ed. 2d 652 (1998).

In the present case, the state adduced evidence from Cepeda-Grullon, which was corroborated by video surveillance footage, that he had been following the defendant's vehicle when he saw it hit the victim and leave the first accident scene. Cepeda-Grullon then testified that he pursued the vehicle and ultimately located it at the second accident scene. Police officers identified the defendant as the individual in the driver's seat of the vehicle that crashed at the second accident scene. A plastic casing that was found to match the defendant's vehicle was found at the first accident scene, and the victim's DNA was found on the defendant's vehicle. Moreover, the police responded to the second accident scene only a short time after the first accident. Considering the combined impact of all of the foregoing evidence, the jury reasonably could have concluded that the state had proven beyond a reasonable doubt that the defendant was the operator of the vehicle that struck the victim.

The defendant's attacks on the evidence introduced by the state are unavailing. The defendant argues that "neither [Clapper] nor [Scheurer], who both witnessed the accident, testified that they could see inside of the

vehicle, how many passengers there were, or the identity of the driver." There was evidence, however, that Cepeda-Grullon observed the vehicle strike the victim, followed the vehicle from the first accident scene, and found the same vehicle at the second accident scene only a short time later. Although Cepeda-Grullon lost sight of the vehicle on two occasions, he found the vehicle at the second accident scene, where the defendant was found in the driver's seat. Cepeda-Grullon then provided a physical description of the driver to the investigating officers, which was similar to that of the defendant.[12] The defendant also relies on Cepeda-Grullon's testimony that he did not see anyone exit the vehicle after the second accident and was not 100 percent certain that there was only one person in the vehicle; however, there is no evidence that any person other than the defendant was in the vehicle or that any other person was seen near the vehicle at the second accident scene. See, e.g., *State* v. *Smith*, 179 Conn. App. 734, 750–51, 181 A.3d 118 (determining that there was sufficient evidence that defendant was operator of motor vehicle when there was ample evidence that he had operated vehicle just prior to his arrest), cert. denied, 328 Conn. 927, 182 A.3d 637 (2018); *State* v. *Sienkiewicz*, 162 Conn. App. 407, 411, 131 A.3d 1222

[12] We note that, although the defendant argues that Cepeda-Grullon "was never asked by the police to identify the driver of the vehicle and did not make an identification of the driver in court," the jury could still rely on the physical description of the driver that Cepeda-Grullon gave to the police as circumstantial evidence. See, e.g., *State* v. *Makins*, 232 Conn. App. 199, 215–16, 335 A.3d 67 (2025), petition for cert. filed (Conn. June 10, 2025) (No. 240398). The defendant's argument that the jury had to "speculate" that the defendant was the operator of the vehicle because he was taken to the hospital is belied by the evidence, including that his identification was located inside the vehicle and that Cepeda-Grullon saw the defendant in the driver's seat. Moreover, Cepeda-Grullon was prevented from identifying the defendant in court because the court had sustained defense counsel's own objection to such an identification, pursuant to *State* v. *Dickson*, 322 Conn. 410, 445–47, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017).

(concluding that there was sufficient evidence of element of operation of motor vehicle when defendant was in driver's seat and no one else was observed in vicinity), cert. denied, 320 Conn. 924, 134 A.3d 621 (2016).

The defendant's attempt to distinguish *State* v. *Teti,* supra, 50 Conn. App. 34, is not persuasive.[13] In *Teti,* this court held that the jury reasonably could have concluded that the defendant operated a vehicle while under the influence of liquor or drugs for purposes of § 14-227a. See id., 40–41. Although the defendant in that case argued that the evidence did not preclude the "reasonable hypothesis" that a third party had operated the vehicle; id., 41; this court held that the jury reasonably could have concluded that the defendant operated the vehicle on the basis of circumstantial evidence, including that there was only one set of footprints in the snow coming from the vehicle, that those footprints matched the defendant's, and that the "only footprints in the area were those of the defendant and the police officers." Id., 40. In the present case, there was no evidence that another individual was operating the vehicle or was in the vicinity of the second accident, where the vehicle was found.

In short, the defendant asks us to draw inferences from the evidence consistent with his theory of innocence. The jury, however, was not required to draw

---

[13] The defendant also attempts to distinguish *State* v. *Tine,* 137 Conn. App. 483, 48 A.3d 722, cert. denied, 307 Conn. 919, 54 A.3d 562 (2012), on the ground that, in *Tine,* the state had the benefit of the statutory presumption in General Statutes § 14-107 (b) with respect to the element of operation because the defendant owned the vehicle involved in the accident. See id., 489; see also General Statutes § 14-107 (b) ("[w]henever there occurs a violation of section . . . 14-224 . . . proof of the registration number of any motor vehicle therein concerned shall be prima facie evidence in any criminal action . . . that the owner was the operator thereof"). Although it is true that the statutory presumption in § 14-107 (b) is not applicable in the present case, the jury had more than sufficient evidence before it, even in the absence of such a presumption, from which it reasonably could

only those inferences consistent with innocence. See *State* v. *Calabrese*, supra, 279 Conn. 402–403. Accordingly, although the state relied on circumstantial evidence to show that the defendant was the operator of the vehicle, that evidence was amply sufficient for the jury reasonably to conclude that the defendant was the operator of the vehicle that struck the victim. See, e.g., *State* v. *Seeley*, 326 Conn. 65, 76, 161 A.3d 1278 (2017) ("[w]hen evaluating the sufficiency of the evidence, [t]here is no distinction between direct and circumstantial evidence so far as probative force is concerned" (internal quotation marks omitted)); *State* v. *Sienkiewicz*, supra, 162 Conn. App. 410 ("[t]here is no requirement that the fact of operation be established by direct evidence" (internal quotation marks omitted)).

B

The defendant also argues that there was "no evidence presented that the defendant's intoxication was the proximate cause of the accident." (Emphasis omitted.) We disagree.

Causation is an essential element of the crimes of assault in the second degree with a motor vehicle and assault in the second degree. See General Statutes § 53a-60 (a) ("[a] person is guilty of assault in the second degree when . . . (3) the actor recklessly *causes* serious physical injury to another person by means of a deadly weapon or a dangerous instrument" (emphasis added)); see also General Statutes § 53a-60d ("[a] person is guilty of assault in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he *causes* serious physical injury to another person as a consequence of the effect of such liquor

have concluded that the defendant operated the motor vehicle that struck the victim.

or drug" (emphasis added)). "In order for legal causation to exist in a criminal prosecution, the state must prove beyond a reasonable doubt that the defendant was both the cause in fact, or actual cause, as well as the proximate cause of the victim's injuries. . . . In order that conduct be the actual cause of a particular result it is almost always sufficient that the result would not have happened in the absence of the conduct; or, putting it another way, that but for the antecedent conduct the result would not have occurred. . . . On the other hand, proximate cause requires that the forbidden result which actually occurs must be enough similar to, and occur in a manner enough similar to, the result or manner which the defendant intended (in the case of crimes of intention), or the result or manner which his reckless or negligent conduct created a risk of happening (in the case of crimes of recklessness and negligence) that the defendant may fairly be held responsible for the actual result even though it does differ or happens in a different way from the intended or hazarded result . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Leroy*, 232 Conn. 1, 5–6 n.6, 653 A.2d 161 (1995).

The defendant argues that evidence of his alleged intoxication was insufficient, standing alone, to establish causation. Contrary to the defendant's argument that the state did not present any evidence of the "effect of [his] intoxication" on the victim's injuries; (emphasis omitted); we conclude that there was sufficient evidence from which the jury reasonably could have inferred that his intoxication caused the victim's injuries. Here, the evidence revealed that the defendant's blood alcohol content was 0.27, well above the legal limit. During trial, the jury heard testimony from Bolduc, who testified that alcohol intoxication inhibits a

person's ability to drive.[14] She further testified that alcohol acts as a central nervous system depressant, which can slow motor skills and functioning. The jurors could have inferred, on the basis of Bolduc's testimony and their own common knowledge and experience, that the defendant's intoxication while operating a motor vehicle caused the victim's injuries. "The condition of intoxication and its common accompaniments are a matter of general knowledge." (Internal quotation marks omitted.) *State* v. *Gordon*, 84 Conn. App. 519, 528, 854 A.2d 74, cert. denied, 271 Conn. 941, 861 A.2d 516 (2004).

Moreover, the jury heard evidence from eyewitnesses that the defendant almost backed into Cepeda-Grullon's vehicle, accelerated toward the victim, hit the victim without braking before the impact, and then left the scene.[15] See, e.g., *State* v. *Guitard*, 61 Conn. App. 531,

---

[14] The defendant argues that Bolduc did not respond to the scene of the second accident or administer any field sobriety tests to the defendant and that Bolduc did not become a drug recognition expert until after the accident. We agree with the state, however, that Bolduc's recall testimony related to the general effects of alcohol and that there was other direct evidence of the defendant's intoxication.

The defendant also asserts, for the first time in his reply brief, that Bolduc was not an expert witness and that expert testimony was required to demonstrate the effects of his intoxication. First, "[i]t is . . . a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *ECR 2, LLC* v. *Thompson*, 232 Conn. App. 586, 595 n.6, 336 A.3d 1275 (2025). Moreover, regardless of whether Bolduc's testimony properly is characterized as lay or expert testimony, the defense neither objected to the admission of Bolduc's testimony before the trial court nor argued that expert testimony of the effects of the defendant's intoxication was necessary and not presented. We therefore decline to address this unpreserved argument.

[15] Although the defendant relies on Bolduc's testimony that the victim most likely was under the influence and failed to yield the right of way, the jury heard that evidence at trial and still concluded that the defendant's intoxication, rather than any conduct of the victim, caused the accident. "We will not now entertain the defendant's request that we discount the state's evidence and give greater weight to evidence proffered by him. The trier is the judge of the credibility of all the witnesses and the weight to be given their testimony and, therefore, has the right to accept part or disregard part of a witness' testimony." (Internal quotation marks omitted.) *State* v.

542, 765 A.2d 30 (there was sufficient evidence that defendant's intoxication was proximate cause of victim's injuries when defendant "crossed into the lane of oncoming traffic and did not appear to decelerate his vehicle"), cert. denied, 255 Conn. 952, 770 A.2d 32 (2001); *State* v. *Kwaak*, 21 Conn. App. 138, 147, 572 A.2d 1015 (holding that there was sufficient evidence that defendant's intoxication caused victim's death when defendant did not take evasive action to avoid collision), cert. denied, 215 Conn. 811, 576 A.2d 540 (1990). The jury viewed video surveillance footage that corroborated the witnesses' recollection of the first accident. Officers noted the absence of any skid marks at the first accident scene.[16] The jury also heard evidence regarding the second accident, which occurred shortly after the first accident, including that the vehicle in which the defendant was later found had crashed into a tree, facing oncoming traffic. When the defendant was removed from the vehicle, he was hostile, and Paradis observed at the hospital that the defendant's eyes were bloodshot, red, and glossy. Viewing the foregoing evidence in the light most favorable to sustaining the verdict, the jury could have reasonably concluded that the evidence established beyond a reasonable doubt that the defendant's intoxication caused the victim's injuries.

C

The defendant further claims that the record contains insufficient evidence that the state proved that the victim suffered serious physical injuries pursuant to §§ 53a-60 (a) (3) and 53a-60d. We disagree.

*Guitard*, 61 Conn. App. 531, 542, 765 A.2d 30, cert. denied, 255 Conn. 952, 770 A.2d 32 (2001).

[16] The defendant argues that an accident reconstruction was not done at the scene of the first accident. McCarthy testified, however, that it was not possible to conduct an accident reconstruction investigation because there were no skid marks, yaw marks, or vehicles left at the scene. Even in the absence of accident reconstruction evidence, there was more than sufficient other evidence to establish causation in the present case.

"Serious physical injury" is defined by General Statutes § 53a-3 (4), for the purposes of both §§ 53a-60 (a) (3) and 53a-60d, as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." The evidence adduced at trial revealed that the victim was brought by ambulance to Lawrence + Memorial Hospital, where she exhibited severe confusion. She was diagnosed with a closed head injury, multiple fractures, and several abrasions and lacerations. After the accident, the victim could not care for herself for approximately three months and had to move in with her parents. The victim testified that, as of the time of trial, she still suffered from short-term memory loss and constant neck and back pain.

Notwithstanding the defendant's argument that medical expert testimony was not offered in this case, such testimony was not required.[17] See *State* v. *Rumore*, 28 Conn. App. 402, 414, 613 A.2d 1328 ("our case law . . . does not require expert medical testimony to establish the element of serious physical injury"), cert. denied, 224 Conn. 906, 615 A.2d 1049 (1992). The jury heard testimony regarding the victim's injuries directly after the accident, and their sequelae, from the victim and her mother. The jury also had before it the victim's medical records, which confirmed her diagnoses, as well as multiple photographs of the victim in the hospital that depict her wearing a neck brace, as well as multiple lacerations of her scalp, nose, and feet, and

---

[17] The defendant also argues that the jury was not instructed that " 'it may be inferred that' any of [the victim's] injuries created an impairment of the function of an organ of her body." To the extent that the defendant, for the first time in his reply brief, attempts to raise a separate instructional error claim with respect to that element of "serious physical injury," which was not raised before the trial court, we decline to review it. See, e.g., *ECR 2, LLC* v. *Thompson*, 232 Conn. App. 586, 595 n.6, 336 A.3d 1275 (2025).

broken teeth. The jury also viewed Bolduc's body camera footage in which the victim is shown lying on the ground at the scene and bleeding.

The defendant argues that the victim did not lose consciousness, was speaking after the accident, and did not require surgical operations to treat her injuries. The absence of such evidence, however, did not preclude the jury from reasonably concluding that the victim sustained serious physical injuries. The nature of the serious physical injury inquiry is fact intensive and is not predicated on a threshold showing of grievousness. See *State* v. *Ovechka*, 292 Conn. 533, 545–46, 975 A.2d 1 (2009); see also, e.g., *State* v. *Lewis*, 146 Conn. App. 589, 607–608, 79 A.3d 102 (2013) (concluding that there was sufficient evidence of serious physical injuries when, although victim did not lose consciousness and recovered, victim sustained forehead laceration that required stitches, nasal fracture, and chipped teeth and had blurred vision and difficulty breathing), cert. denied, 311 Conn. 904, 83 A.3d 605 (2014). The defendant also argues that the victim was able to live on her own and to work after the accident. It is well established, however, that "the term 'serious physical injury' does not require that the injury be permanent." *State* v. *Barretta*, 82 Conn. App. 684, 689, 846 A.2d 946, cert. denied, 270 Conn. 905, 853 A.2d 522 (2004); see also, e.g., *State* v. *Petion*, 332 Conn. 472, 489, 211 A.3d 991 (2019) (stating that permanence is not "a necessary condition for serious disfigurement . . . neither is it a sufficient condition, in and of itself, to establish serious disfigurement" (citation omitted; footnote omitted)). Moreover, even though the victim was living on her own at the time of trial, she testified that she continued to suffer the effects of her injuries. Accordingly, the jury reasonably rejected the defendant's invitation to conclude that the victim did not suffer serious physical injuries.

"[W]hether [the victim] suffered a 'serious physical injury' was a question of fact for the jury." *State* v. *Almeda*, 211 Conn. 441, 450, 560 A.2d 389 (1989). We decline to substitute our judgment for that of the jury. See, e.g., id. On the record before us, we cannot conclude, as a matter of law, that there was insufficient evidence from which the jury could reasonably have found that the victim suffered a serious physical injury. See, e.g., *State* v. *Leveille*, 232 Conn. App. 687, 698 and n.10, 337 A.3d 797 (2025). We therefore reject the defendant's sufficiency claim.

## II

The defendant also claims that his convictions of assault in the second degree with a motor vehicle and assault in the second degree, arising from a single occurrence or act, violated his rights as guaranteed by the double jeopardy clause of the fifth amendment to the United States constitution and the Connecticut constitution. We disagree.

"A defendant's double jeopardy claim presents a question of law, over which our review is plenary." (Internal quotation marks omitted.) *State* v. *Bernacki*, 307 Conn. 1, 9, 52 A.3d 605 (2012), cert. denied, 569 U.S. 918, 133 S. Ct. 1804, 185 L. Ed. 2d 811 (2013). "The double jeopardy clause of the fifth amendment to the United States constitution provides: [N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . . This constitutional provision is applicable to the states through the due process clause of the fourteenth amendment. . . . The Connecticut constitution provides coextensive protection, with the federal constitution, against double jeopardy. . . .[18] This constitutional guarantee serves three separate functions: (1) It protects against a second prosecution for the same offense after acquittal. [2] It protects

---

[18] "The Connecticut constitution does not contain an express prohibition against double jeopardy, but the due process guarantees of article first, § 8, of the constitution of Connecticut have been interpreted to include a

against a second prosecution for the same offense after conviction. [3] And it protects against multiple punishments for the same offense [in a single trial]. . . . In the present appeal, the defendant's claim implicates the last of these three functions.

"The double jeopardy analysis in the context of a single trial is a two part process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met. . . . With respect to cumulative sentences imposed in a single trial, the [d]ouble [j]eopardy [c]lause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended. . . . [T]he role of the constitutional guarantee [against double jeopardy] is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense. . . . On appeal, the defendant bears the burden of proving that the prosecutions are for the same offense in law and fact. . . .

"With respect to the first part of this two part process, it is not uncommon that we look to the evidence at trial and to the state's theory of the case . . . in addition to the information against the defendant, as amplified by the bill of particulars. . . . If it is determined that the charges arise out of the same act or transaction, then the court proceeds to [part two of the analysis], where it must be determined whether the charged crimes are the same offense. . . . At this second step, we [t]raditionally . . . have applied the *Blockburger*

protection against double jeopardy. See *State* v. *Michael J.*, 274 Conn. 321, 349–50, 875 A.2d 510 (2005). The scope of this state constitutional protection consistently has been construed to mirror, rather than to exceed, the protection afforded under the federal constitution. Id." *State* v. *Oscar H.*, 204 Conn. App. 207, 241 n.25, 252 A.3d 842, cert. denied, 338 Conn. 912, 259 A.3d 654 (2021).

test[19] to determine whether two statutes criminalize the same offense, thus placing a defendant prosecuted under both statutes in double jeopardy: [W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact [that] the other does not.[20] . . . In applying the *Blockburger* test, we look only to the information and bill of particulars—as opposed to the evidence presented at trial—to determine what constitutes a lesser included offense of the offense charged. . . .[21] Stated differently, only

[19] "See *Blockburger* v. *United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)." *State* v. *Oscar H.*, 204 Conn. App. 207, 242 n.26, 252 A.3d 842, cert. denied, 338 Conn. 912, 259 A.3d 654 (2021).

[20] "Both our Supreme Court and the United States Supreme Court have clarified that the *Blockburger* test, which also is referred to as the *same-elements* test, inquires whether each offense contains an element not contained in the other; if not, they are the same offence and double jeopardy bars additional punishment and successive prosecution. . . . *United States* v. *Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 125 L. Ed. 2d 556 (1993). In *State* v. *Bernacki*, [supra, 307 Conn. 21–22], our Supreme Court emphasized that it is irrelevant for purposes of a *Blockburger* analysis that the state may have relied on the same evidence to prove that the elements of both statutes were satisfied; id., 21; and that proper application of the *Blockburger* test looks at whether each statute contains a different statutory element requiring proof of a fact that the other does not . . . . Id., 22. The court further noted that emphasis on the conduct at issue, rather than purely on the statutory language and charging instruments, is not consistent with our well established case law holding that the *Blockburger* analysis is theoretical in nature and not dependent on the actual evidence adduced at trial. Id., 21 n.16." (Emphasis altered; internal quotation marks omitted.) *State* v. *Oscar H.*, 204 Conn. App. 207, 242–43 n.27, 252 A.3d 842, cert. denied, 338 Conn. 912, 259 A.3d 654 (2021).

[21] "As our Supreme Court has stated, the *Blockburger* test is, at its core, a rule of statutory construction, and 'because it serves as a means of discerning [legislative] purpose the rule should not be controlling [if], for example, there is a clear indication of contrary legislative intent. . . . Thus, the *Blockburger* test creates only a rebuttable presumption of legislative intent, [and] the test is not controlling [if] a contrary intent is manifest. . . . [If] the conclusion reached under *Blockburger* is that the two crimes do not constitute the same offense, the burden remains on the defendant to demonstrate a clear legislative intent to the contrary.' . . . *State* v. *Alvaro F.*, 291 Conn. 1, 12–13, 966 A.2d 712, cert. denied, 558 U.S. 882, 130 S. Ct. 200, 175

[i]f the elements of one offense as defined by the statute include the elements of a lesser offense; or if one offense is merely nominally distinct from the other will double jeopardy attach." (Citations omitted; emphasis omitted; footnotes in original; internal quotation marks omitted.) *State* v. *Oscar H.*, 204 Conn. App. 207, 241–43, 252 A.3d 842, cert. denied, 338 Conn. 912, 259 A.3d 654 (2021).

The state does not dispute the defendant's assertion that his conviction of assault in the second degree with a motor vehicle and assault in the second degree arose from the same act or transaction. The issue is whether they constitute the same offense.[22] We must therefore examine the language of §§ 53a-60 (a) (3) and 53a-60d, as well as the operative substitute information,[23] to determine whether, as charged, "there was any element that the state was required to prove under one statute that was different from an element under the other." *State* v. *Nixon*, 231 Conn. 545, 551, 651 A.2d 1264 (1995).

Section 53a-60 (a) (3), assault in the second degree, requires the state to prove that a person "recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument . . . ." Section 53a-60d (a), assault in the second degree with a motor vehicle, requires the state to prove that a person, "while operating a motor vehicle under the influence of intoxicating liquor or any drug or both . . . causes serious physical injury to another person as a consequence of the effect of such liquor or drug." The operative substitute information with which the defendant was charged essentially duplicated this language.[24]

---

L. Ed. 2d 140 (2009)." *State* v. *Oscar H.*, 204 Conn. App. 207, 243 n.28, 252 A.3d 842, cert. denied, 338 Conn. 912, 259 A.3d 654 (2021).

[22] The defendant has not argued that either assault in the second degree with a motor vehicle or assault in the second degree is a lesser included offense of the other.

[23] The defendant has not disputed that he did not request a bill of particulars in this case.

[24] Count two of the operative information provided in relevant part: "[T]he defendant . . . while operating a motor vehicle under the influence of intox-

We conclude that the relevant statute and information on each charge at issue requires proof of elements that the statute and information on the other charge do not.[25]

Most significantly, with respect to the element of intent, to prove assault in the second degree under § 53a-60 (a) (3), the state must prove that the defendant "recklessly" caused serious physical injury to another person by means of a deadly weapon or dangerous instrument. In contrast, assault in the second degree with a motor vehicle under § 53a-60d is a general intent crime, requiring the state to prove that the defendant, while operating a motor vehicle under the influence of intoxicating liquor, caused another person serious physical injury. "The intent element in each statute consequently requires proof of a fact which the other does not." (Internal quotation marks omitted.) *State* v. *Nixon*, supra, 231 Conn. 552; see, e.g., id., 553–54, 563 (concluding that defendant's convictions of assault of correctional officer pursuant to General Statutes § 53a-167c (a) (1) and assault in second degree under § 53a-60 (a) (5) did not violate double jeopardy clause because it was possible for defendant to commit one crime and not other).

Furthermore, § 53a-60 (a) (3) requires proof that a person used a "deadly weapon or a dangerous instrument" to cause serious physical injuries to another person. Section 53a-60d is narrower, however, and requires proof that a person caused serious physical injury to another person "while operating a motor vehicle under

icating liquor and any drug [or] both, cause[d] serious physical injury to another person . . . as a consequence of the effects of such liquor and drugs."

Count three of the operative information provided in relevant part: "[T]he defendant did recklessly cause serious physical injury to another person . . . by means of a dangerous instrument."

[25] We agree with the defendant, and the state does not dispute, that the elements of "serious physical injury" and causation require the same proof under both §§ 53a-60 (a) (3) and 53a-60d.

the influence of intoxicating liquor or any drug or both . . . ." Thus, a person may commit the crime of assault in the second degree under § 53a-60 (a) (3) without operating a motor vehicle and/or being intoxicated, which is an essential element of assault in the second degree with a motor vehicle under § 53a-60d. See, e.g., *State* v. *Ovechka*, supra, 292 Conn. 547 (evidence supported finding that pepper spray was dangerous instrument). Likewise, a person may commit the crime of assault in the second degree with a motor vehicle without committing the crime of assault in the second degree if the fact finder determines that the defendant's conduct was not reckless. Cf., e.g., *State* v. *Borrelli*, 94 Conn. App. 849, 862, 895 A.2d 257 (2006) (trial court did not issue inconsistent decisions when it rejected defendant's defense of involuntary intoxication with respect to charge of operating motor vehicle while under influence because defendant showed general intent to operate motor vehicle, while also finding defendant not guilty of reckless driving in light of defendant's involuntary intoxication). Accordingly, it is possible for a person to commit either assault in the second degree with a motor vehicle or assault in the second degree, without committing the other crime.

Indeed, the defendant's counsel acknowledged at oral argument before this court that the statutory language of the two offenses differs. To the extent that the defendant argues that "neither charge required proof of a fact that the other did not," we disagree. For example, the defendant argues that his alleged intoxication was the same evidence used to show that his conduct was reckless under § 53a-60 (a) (3).[26] The defendant also

_____

[26] Because we decline to examine the evidence at this stage of the *Blockburger* analysis, we need not address the state's argument that it presented other evidence of the defendant's recklessness at trial, namely, evidence that Cepeda-Grullon saw the defendant's vehicle speed up as it headed toward the victim.

asserts that, although the statutory language differs because § 53a-60d requires proof that the defendant "operat[ed] a motor vehicle," whereas § 53a-60 (a) (3) requires proof that the defendant utilized a "dangerous instrument," "in effect and *as applied to the defendant's case*, they are the same element and require proof of the same fact . . . ." (Emphasis added.) These arguments essentially invite us to look beyond the information to the evidence to determine whether assault in the second degree with a motor vehicle and assault in the second degree are the same offense. Under the technical analysis of the *Blockburger* test, however, we look only to the statutory elements and the operative information in determining whether the crimes at issue constitute the same offense. See, e.g., *State* v. *Nixon*, supra, 231 Conn. 551. As we previously stated, the fact that the same evidence was used to establish that the defendant committed each crime is irrelevant. See *State* v. *Oscar H.*, supra, 204 Conn. App. 242 n.27.

Our analysis, however, does not end here. "[T]he *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history. . . . The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning congressional purpose the rule should not be controlling whe[n], for example, there is a clear indication of contrary legislative intent. . . . The language, structure, and legislative history of a statute can provide evidence of this intent. . . . If the legislature clearly expressed an intention that the statutes were designed to punish the same offense, then prosecution under both statutes would violate the double jeopardy clause." (Citations omitted; internal quotation marks omitted.) *State* v. *Nixon*, supra, 231 Conn. 555.

"When divining legislative intent in the double jeopardy context, our Supreme Court has considered several factors, including: (1) whether the statutes were

designed to protect separate and distinct interests of society . . . (2) whether the statute in question references other statutory offenses . . . (3) whether the statute in question set[s] forth a separate penalty rather than using a multiplier of the penalty for another offense . . . (4) the presence of language expressly prohibiting cumulative punishments . . . (5) the placement of each offense within the General Statutes . . . and (6) the legislative history of the challenged statute . . . .'' (Citations omitted; internal quotation marks omitted.) *State* v. *Burgos*, 170 Conn. App. 501, 552, 155 A.3d 246, cert. denied, 325 Conn. 907, 156 A.3d 538 (2017).

The defendant argues that the legislature did not intend for multiple punishments under these circumstances. Specifically, the defendant asserts that he cannot be convicted of assault in the second degree and assault in the second degree with a motor vehicle when "there is a single assault, and an absence of legislative history indicating an intent for multiple punishments to be available for one criminal act." We are not persuaded. First, the statutory scheme supports our determination that §§ 53a-60 and 53a-60d are different offenses. Neither statute refers to the other, and each statutory offense sets out its own penalty: assault in the second degree is a class C felony when the offense results in serious physical injury, and assault in the second degree with a motor vehicle is a class D felony. See, e.g., *State* v. *Delgado*, 19 Conn. App. 245, 255, 562 A.2d 539 (1989); see also General Statutes §§ 53a-60 (b) and 53a-60d (b). Furthermore, § 53a-60d (b) provides for penalties that § 53a-60 (a) (3) does not. Specifically, § 53a-60d (b) provides in relevant part that, upon conviction, "the court shall suspend the motor vehicle operator's license or nonresident operating privilege of any person found guilty under this section for one year. The court shall also order such person not to operate any motor vehicle that is not equipped with an approved ignition interlock

device, as defined in section 14-227j, for a period of two years after such person's operator's license or non-resident operating privilege is restored by the Commissioner of Motor Vehicles."

We further note the absence of any express language in § 53a-60d to indicate that the legislature intended that a person convicted of assault in the second degree with a motor vehicle could not also be convicted of assault in the second degree. By contrast, "our Penal Code is replete with other statutes in which the legislature expressly has barred conviction of two crimes for one action. See, e.g., General Statutes § 53a-55a (a) ('[n]o person shall be found guilty of manslaughter in the first degree and manslaughter in the first degree with a firearm upon the same transaction') . . . . In view of this common practice, we ordinarily presume that the legislature's failure to include such terms in [§ 53a-60d] indicates that it did not intend a similar result." (Citations omitted.) *State* v. *Kirsch*, 263 Conn. 390, 418–19, 820 A.2d 236 (2003).

The defendant also argues that he cannot be convicted of §§ 53a-60 and 53a-60d "whe[n] there is a single assault and an absence of legislative history indicating an intent for multiple punishments to be available for one criminal act."[27] We are unpersuaded.

---

[27] In support of his argument that the legislature did not intend for multiple punishments in these circumstances, the defendant cites *State* v. *Nixon*, 92 Conn. App. 586, 589, 597, 886 A.2d 475 (2005), for the proposition that "multiple assault convictions arising out of a single act of assault violate double jeopardy." That case is distinguishable. In that case, the defendant was charged with two counts of the same crime, assault in the second degree under § 53a-60 (a) (2), for conduct that arose from one continuous assault. *State* v. *Nixon*, supra, 587. In the present case, by contrast, although it is true that there was only one assault, the defendant was charged with two separate crimes: assault in the second degree with a motor vehicle and assault in the second degree. "It is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the [d]ouble [j]eopardy [c]lause." *Albernaz* v. *United States*, 450 U.S. 333, 345 n.3, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981).

In 1969, the legislature approved Public Acts 1969, No. 828, the first iteration of Connecticut's Penal Code. See *State* v. *Terwilliger*, 314 Conn. 618, 654, 104 A.3d 638 (2014). Thereafter, the legislature codified § 53a-60, to take effect on October 1, 1971. See Public Acts 1969, No. 828, § 215. Section 53a-60 (a) originally proscribed several types of conduct, including recklessly causing serious physical injury to another person by means of a deadly weapon or a dangerous instrument, the conduct alleged in the present case. See Public Acts 1969, No. 828, § 61. The legislature enacted § 53a-60d in 1982 as a new statute, which was introduced as part of a comprehensive reform effort to enhance criminal penalties for driving while under the influence. See Public Acts 1982, No. 82-403, § 2 (P.A. 82-403).

The statutes at issue have distinct purposes. An obvious purpose of § 53a-60 (a) (3) is to proscribe reckless, assaultive conduct. Section 53a-60d has the more targeted, specific purpose of proscribing the operation of a motor vehicle while under the influence of an intoxicating liquor or drug.[28] See, e.g., *Albernaz* v. *United States*, 450 U.S. 333, 343, 101 S. Ct. 1137, 67 L. Ed. 2d 275 (1981) (concluding that Congress intended to permit imposition of consecutive sentences with respect to two conspiracy statutes when those statutes were directed to "separate evils"); *State* v. *Greco*, 216 Conn. 282, 293, 296, 579 A.2d 84 (1990) (conviction of felony murder, robbery in first degree and burglary in first degree did not violate double jeopardy because "[a]n obvious purpose of the felony murder statute . . . is to protect human life," whereas robbery statutes were intended to protect against forcible taking); *State* v.

---

[28] Although §§ 53a-60 (a) (3) and 53a-60d are located in the same part of the Penal Code, titled "Assault and Related Offenses," "that the statutes were designed to protect separate and distinct interests of society, rather than where they are situated is more indicative of whether the legislature intended to create separate crimes and separate punishments." (Internal quotation marks omitted.) *State* v. *Bernacki*, supra, 307 Conn. 29.

*Dunbar*, 37 Conn. App. 338, 346–47, 656 A.2d 672 (defendant's convictions of assault on peace officer and assault in second degree did not violate double jeopardy because statutes were enacted with different intents), cert. denied, 233 Conn. 906, 657 A.2d 644 (1995).

The apparent intent of the legislature was not to merge § 53a-60 (a) (3) into § 53a-60d but, instead, to enact a *new* offense.[29] See, e.g., *State* v. *Nixon*, supra, 231 Conn. 561 (concluding that apparent intent of legislature was "not to merge the class D felony of § 53a-60 (a) (5) into the class C felony of § 53a-167c (a) (1), but instead to make the class D felony of § 53a-60 (a)

---

[29] In making this determination, we are mindful of our Supreme Court's recent decision in *State* v. *Williams*, 352 Conn. 104, 107–109, 335 A.3d 792 (2025), in which the court held that the defendant's conviction of criminal possession of a firearm and criminal possession of ammunition in violation of the same statute, General Statutes § 53a-217 (a), violated double jeopardy. The court concluded that § 53a-217 (a) was ambiguous with respect to the legislature's intent to treat criminal possession of a firearm and ammunition as separate offenses. Id., 134–35. The court looked to the legislative history and stated that "the addition of 'ammunition' in § 53a-217 appears to be directed to a situation in which someone, who was not legally allowed to have ammunition, was found in possession of ammunition, such as on their person or in a car, but not in a loaded gun." Id., 136. The court concluded, applying the rule of lenity, that, even if the legislative history did not clarify the meaning of the statute, allowing multiple punishments for possessing a firearm and the ammunition contained within that firearm would violate double jeopardy. Id., 136–37.

We believe that the present case is distinguishable because, here, the statutory scheme unambiguously reveals the legislature's intent, in enacting § 53a-60d, to create the new offense of assault in the second degree with a motor vehicle. See, e.g., *Albernaz* v. *United States*, supra, 450 U.S. 342 (noting that "touchstone" of rule of lenity "is statutory ambiguity," and, when the legislature "has manifested its intention, we may not manufacture ambiguity in order to defeat that intent" (internal quotation marks omitted)). As stated previously, §§ 53a-60 (a) (3) and 53a-60d were enacted with distinct purposes. By contrast, the harm targeted by the criminal possession of firearms and ammunition in § 53a-217 (a) is the same: to prevent the unlawful arming of felons. See *State* v. *Williams*, supra, 352 Conn. 135–37. Finally, although the addition of "ammunition" was apparently added to § 53a-217 to fill a gap in prosecutions under that existing statute; see id.; in the present case, § 53a-60d was enacted as one of several new statutes to fill a gap contained in the criminal law generally.

(5) the basis of a *new* class *B* felony" (emphasis in original)). It is well settled that "the legislature, in amending or enacting statutes, always [is] presumed to have created a harmonious and consistent body of law . . . ." (Internal quotation marks omitted.) *State* v. *Courchesne*, 296 Conn. 622, 709, 998 A.2d 1 (2010); see also *State* v. *Nixon*, supra, 231 Conn. 559 ("[w]hen the legislature acts . . . it is presumed to know the state of the law").

The defendant argues that § 53a-60d was designed to fill a "gap" in the law, specifically, to "address a problem the legislature saw in drunk driving accidents resulting in serious physical injury." We agree that the legislature enacted § 53a-60d with the intent to fill a gap in the existing law. See 25 H.R. Proc., Pt. 9, 1982 Sess., p. 2271, remarks of Representative Richard D. Tulisano (noting that legislation "sets up a new series of penalties for causing injury or death while driving a motor vehicle while intoxicated by either drugs or alcohol"); see also 25 S. Proc., Pt. 11, 1982 Sess., p. 3601, remarks of Senator Myron R. Ballen (noting that existing laws proscribing driving while under influence of intoxicating liquor or other drugs "are not strong enough to put people away"); id., p. 3642, remarks of Senator Russell L. Post, Jr. ("What we're saying is that if, indeed, you are involved, while intoxicated, in an accident that involves a fatality, manslaughter or what have you, you've got to be prosecuted. . . . We're trying to . . . make it clear that if, indeed, you're arrested for drunken driving and there is this kind of an accident, you're going to be prosecuted for that offense.").[30] Number 82-403 of the 1982 Public Acts is titled "An Act Concerning Criminal

---

[30] Moreover, in written testimony submitted to the Joint Standing Committee on the Judiciary, Austin J. McGuigan, then chief state's attorney, submitted that "[t]he increasing number of alcohol-related deaths and injuries on [s]tate highways makes it necessary to advocate stiffer penalties for those driving under the influence." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1982 Sess., p. 419.

Penalties For Driving While Intoxicated," which indicates the legislature's intent to enact a series of new criminal offenses, including § 53a-60d, to address the same harm: operating a motor vehicle while under the influence of an intoxicating liquor or drug. See, e.g., *State* v. *Kozlowski*, 199 Conn. 667, 678, 509 A.2d 20 (1986) ("[i]n attempting to glean legislative intent, it is often useful to examine the title of a proposed bill . . . and the purpose the legislature intended to accomplish by its enactment" (citation omitted)).

Our Supreme Court also previously has noted—in discussing manslaughter in the second degree pursuant to General Statutes § 53a-56b, which was also enacted as part of P.A. 82-403—that the legislature had intended to "enhance the existing criminal penalties for causing physical injury or death when driving while intoxicated in order to deter such conduct." *State* v. *Kirsch*, supra, 263 Conn. 419; see also, e.g., *McCoy* v. *Commissioner of Public Safety*, 300 Conn. 144, 170, 12 A.3d 948 (2011).

Although we agree with the defendant that the legislature enacted § 53a-60d with the apparent intention of filling a gap in the existing law, we disagree that this intention clearly demonstrates that the legislature intended to treat §§ 53a-60 (a) (3) and 53a-60d as the same offense. This court has stated that, "[w]henever the legislature fills a gap in the criminal law, it is fair to infer, absent clear legislative history to the contrary, that it is seeking to provide the executive branch with an addition to its existing law enforcement arsenal, rather than a substitute for an already existing offense." *State* v. *Delgado*, supra, 19 Conn. App. 256. We have carefully reviewed the legislative history of §§ 53a-60 (a) (3) and 53a-60d and have not found any indication as to whether the legislature intended to preclude or to permit the prosecution of assault in the second degree or assault in the second degree with a motor vehicle when the state has commenced the prosecution of the other offense for the same conduct. "Therefore,

we are left with silence on the issue, from which we do not determine legislative intent." (Internal quotation marks omitted.) *State* v. *Wyatt*, 80 Conn. App. 703, 713, 836 A.2d 1242 (2003), cert. denied, 267 Conn. 918, 841 A.2d 1192 (2004); see also, e.g., *Albernaz* v. *United States*, supra, 450 U.S. 341–42 ("[I]f anything is to be assumed from the congressional silence on this point, it is that Congress was aware of the *Blockburger* rule and legislated with it in mind. It is not a function of [appellate courts] to presume that Congress was unaware of what it accomplished . . . ." (Internal quotation marks omitted.)).

We conclude that the defendant has not established a clear legislative intent to treat §§ 53a-60 (a) (3) and 53a-60d as one offense for double jeopardy purposes.[31] See, e.g., *State* v. *Dunbar*, supra, 37 Conn. App. 347–48. Having failed to rebut the presumption under *Blockburger*, the defendant cannot prevail on his double jeopardy claim.[32]

---

[31] We decline the defendant's invitation to apply the rule of lenity because "that principle is inapplicable given the lack of ambiguity in the statutory scheme after application of the *Blockburger* analysis and review of the legislative history. See . . . *Albernaz* v. *United States*, [supra, 450 U.S. 342] (Where [the legislature] has manifested its intention, we may not manufacture ambiguity in order to defeat that intent. . . . Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one. The rule comes into operation at the end of the process of construing what [the legislature] has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers. . . .)." (Citation omitted; internal quotation marks omitted.) *State* v. *Bernacki*, supra, 307 Conn. 30 n.24.

[32] We also reject the defendant's argument that "[t]here has only been one case . . . where a defendant was convicted of assault [in the] second [degree] under the theory that operation of a motor vehicle constituted the use of a dangerous instrument, and where the defendant was intoxicated at the time of the accident," citing *State* v. *Guitard*, supra, 61 Conn. App. 531. First, the defendant's counsel acknowledged at oral argument before this court that there may be cases aside from *Guitard* in which a defendant was convicted of assault in the second degree with a motor vehicle and assault in the second degree that were not appealed. Furthermore, the "decisions by the state's attorneys as to the offenses with which they will charge a defendant require inherently fact intensive inquiries. We will not

### III

The defendant's final claim is that the trial court's supplemental instruction to the jury in response to a note misled the jury. Specifically, the defendant argues that the court's "supplemental instruction that serious physical injury did not need to be long-term crossed into the purview of the [jurors], who were the sole fact finders tasked with determining what constituted 'serious physical injury,' and misled them." We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. After closing arguments, the court delivered its initial instructions to the jury on the relevant law, which included an instruction on "serious physical injury," an essential element of both §§ 53a-60 and 53a-60d. Specifically, the court instructed the jury in relevant part: "Serious physical injury is something more serious than mere physical injury, which is defined as impairment of physical condition or pain. It is more than a minor or superficial injury. It is defined by statute as physical injury which creates a substantial risk of death or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any . . . bodily organ."[33]

The court provided the jurors with a paper copy of the jury instructions for their use during deliberations. The jury then began its deliberations and, thereafter, sent the following note to the court: "Serious physical

___

[second-guess] the rationality of those decisions in the absence of persuasive reasons for doing so." *State* v. *Kirsch*, supra, 263 Conn. 422–23.

[33] The defendant has not challenged the court's initial charge on the element of serious physical injury. The court's initial instruction tracks the definition of " '[s]erious physical injury' " pursuant to § 53a-3 (4) and as contained in the Connecticut model criminal jury instructions. See Connecticut Criminal Jury Instructions 6.1-9, available at https://jud.ct.gov/JI/criminal/criminal.pdf (last visited September 22, 2025).

injury, must this be long term or at [occurrence]?" Upon receiving the note, the court discussed the matter with counsel. The court proposed responding to the note by informing the jurors that "it does not need to be long-term, and I will refer them to the instruction that I've already given them regarding serious physical injury." Defense counsel, in response, requested that the court "reread the instruction on serious physical injury to them and [not] give them a direct answer on that." In the alternative, defense counsel requested that the court "remind them they're the finders of fact and [permanence] is something they can consider in consideration of that question." The court noted defense counsel's exception. The court then called the jury back to the courtroom and issued a supplemental instruction: "Court exhibit five indicates, 'serious physical injury, must this be long-term or at occurrence?' And, the answer is— one is, obviously, I'm referring to the instruction on serious physical injury, does describe in some detail as to what the state . . . considers serious physical injury. So, I do refer to that. I'm not [going to] read it again. I know you have a copy of that. But, the short answer to your question is, it does not need to be long-term, [it] does not need to be permanent."

With the entirety of the court's jury instructions in mind, we next set forth the legal principles that guide our analysis. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . Accordingly, [i]n reviewing a constitutional

challenge to the trial court's instruction, we must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Turner*, 181 Conn. App. 535, 570, 187 A.3d 454 (2018), aff'd, 334 Conn. 660, 224 A.3d 129 (2020). "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review. . . . This standard of review also applies to supplemental instructions." (Citation omitted; internal quotation marks omitted.) *State* v. *Moon*, 192 Conn. App. 68, 75, 217 A.3d 668 (2019), cert. denied, 334 Conn. 918, 222 A.3d 513 (2020).

On the basis of our review of the entire jury charge, we conclude that it is not reasonably possible that the jury was misled by the court's supplemental instruction. The defendant does not challenge the court's original instruction regarding the element of serious physical injury. With respect to the supplemental charge, the court "properly answered the specific question that was raised by the jury; see Practice Book § 42-27;[34] and did not contradict . . . its previous instructions." (Footnote in original.) *State* v. *Turner*, supra, 181 Conn. App. 571; see also, e.g., *State* v. *Delgado*, 247 Conn. 616, 627, 725 A.2d 306 (1999) (concluding that "it [was] not reasonably possible that the jury was misled" when court did not contradict concededly correct initial and first supplemental charges in challenged second supplemental charge).

---

[34] "Practice Book § 42-27 provides: 'If the jury, after retiring for deliberations, requests additional instructions, the judicial authority, after providing notice to the parties and an opportunity for suggestions by counsel, shall recall the jury to the courtroom and give additional instructions [necessary] to respond properly to the request or to direct the jury's attention to a portion of the original instructions.' " *State* v. *Turner*, supra, 181 Conn. App. 571 n.21.

The defendant's argument that the court's instruction was "unnecessarily rigid and misled the [jurors] by taking away their fact-finding ability to determine what constitutes serious physical injury . . . and whether [the victim's] injuries fit that description" is unavailing. The court answered the jury's question, namely, whether the victim's injuries must be long-term, and that answer was correct in law. See *State* v. *Barretta*, supra, 82 Conn. App. 689; see also, e.g., *State* v. *Moon*, supra, 192 Conn. App. 83 (defendant could not prevail on supplemental instructional error claim because instruction was proper statement of law). The court did not state that permanence was not a factor the jury could consider in determining whether the victim sustained a serious physical injury. Finally, the court referred the jury to its original instructions, a copy of which was in the jury's possession, and those instructions provided a correct definition of serious physical injury.[35] The defendant therefore cannot prevail on his claim of instructional impropriety.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[35] We also reject the defendant's argument that the court should have "remind[ed] the jury that it was the sole fact finder . . . ." The court's original instructions informed the jurors that they were the "sole judges of the facts." The court need not have repeated that instruction when the jury did not express any confusion on that point.